**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 11 |
| ALL YEAR HOLDINGS LIMITED, ) | |
| ) | |
| Debtor, ) | Bankruptcy Case No. 21-12051 (MG) |
| _____ ) | |
| ) | |
| AYH WIND DOWN LLC, THROUGH OFER ) | |
| TZUR AND AMIR FLAMER, SOLELY IN THEIR ) | |
| JOINT CAPACITY AS CLAIMS ) | |
| ADMINISTRATOR, ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary No. 23-01180-mg |
| ) | |
| YOEL SILBERSTEIN, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I, II, AND IV OF THE AMENDED COMPLAINT**

TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL BACKGROUND .....................................................................................................2

LEGAL STANDARD................................................................................................................2

ARGUMENT............................................................................................................................3

    I.      Plaintiff is Entitled to Summary Judgment on Count I ................................................3

    II.     Plaintiff is Entitled to Summary Judgment on Counts II and IV ................................5

          A.      The Release and 2020 Agreement Are Fraudulent Under § 548(a)(1)(B)...5

                i.     The Debtor Never Owed Silberstein Anything .....................................6

                ii.    Goldman Pays Off Silberstein with the Debtor's Funds .......................9

                iii.   Two Years Later Goldman Releases Silberstein from the Note..........10

                iv.   The Debtor Was Indisputably Insolvent on October 1, 2020. ..............11

          B.      The Release and 2020 Agreement Are Fraudulent Under N.Y. Debtor & Creditor Law § 273................................................................................13

CONCLUSION ......................................................................................................................15

TABLE OF AUTHORITIES

PAGE

**Cases**

*245 E. 19 Realty LLC v. 245 E. 19th St. Parking LLC*, 80 Misc. 3d 1206(A), 194 N.Y.S.3d 923 (N.Y. Sup. Ct. 2023) ............................................................................................................. 13

*AGFA Photo USA v. Chromazone, Inc.*, 82 A.D.3d 402 (1st Dep't 2011) ................................... 4

*Crawford v. Dep't of Investigation*, 324 F. App'x 139 (2d Cir. 2009) ........................................... 8

*In re e2 Communications, Inc.*, 320 B.R. 849 (Bankr. N.D. Tex. 2004) ........................................ 6

*In re Fleming Packaging Corp.*, No. 03-82408, 2005 WL 2205703 (Bankr. C.D. Ill. Aug. 26, 2005) ......................................................................................................................................... 5

*In re Lyondell Chem. Co.*, 567 B.R. 55 (Bankr. S.D.N.Y. 2017), aff'd, 585 B.R. 41 (S.D.N.Y. 2018) ........................................................................................................................................ 11

*In re Martino*, 652 B.R. 416 (Bankr. E.D.N.Y. 2023) ................................................................. 13

*In re Molina*, 657 B.R. 172 (Bankr. E.D.N.Y. 2023) ................................................................... 13

*In re Residential Cap.*, 533 B.R. 379 (Bankr. S.D.N.Y. 2015) ...................................................... 2

*In re Teligent, Inc.*, 325 B.R. 81 (Bankr. S.D.N.Y.) ...................................................................... 5

*In re Trinsum Grp., Inc.*, 467 B.R. 734, 739 (Bankr. S.D.N.Y. 2012) ........................................... 3

*Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574 (1986) ..................................................... 2

*Noise in The Attic Prods. v. London Records*, 10 A.D.3d 303 (1st Dep't 2004) ........................... 3

*Ralusa, Inc. v. 1101 43rd Ave.*, 2015 WL 7348963 (N.Y. Sup. Ct. N.Y. Cty. Nov. 20, 2015) ...... 3

*Western World Ins. v. Stack Oil*, 922 F.2d 118 (2d Cir. 1990) ...................................................... 2

**Statutes**

11 USC § 101 ............................................................................................................................ 5, 10
11 USC § 548 ........................................................................................................................ passim

**Other Authorities**

N.Y. DEBTOR & CREDITOR LAW § 273 .................................................................................. 12, 13

**Rules**

FED. R. CIV. P. 56(e) ................................................................................................................... 2, 8

AYH Wind Down LLC (*"Plaintiff"* or *"Wind Down Co."*), through Ofer Tzur and Amir Flamer jointly as Claims Administrator under All Year Holdings Ltd.'s (the *"Debtor"*) confirmed Third Amended Chapter 11 Plan of Reorganization (the *"Plan"*), respectfully submits this memorandum of law in support of its motion seeking partial summary judgment on Counts I, II and IV of the Amended Adversary Complaint (the *"Complaint"*) against Defendant Yoel Silberstein (*"Defendant"* or *"Silberstein"*) and on Silberstein's affirmative defenses thereto.

### PRELIMINARY STATEMENT

This is a straight-forward action for non-payment of a promissory note, about which there are no disputed material facts. Defendant does not dispute that he executed the promissory note, borrowing $3,350,000 from the Debtor in 2018. He does not dispute that he received the $3,350,000 in loan proceeds. He does not dispute that he failed to repay the note. Those essential elements to Plaintiff's breach of contract claim are additionally established by contemporaneous written records, including the duly executed promissory note and bank records showing the distribution of the loan proceeds as well as the failure to repay those proceeds. Given this evidence, Plaintiff's breach of contract claim is therefore not only undisputed, it is beyond dispute.

Defendant's refusal to repay the note comes down to a single defense: a "release," given to him by his close friend, Yoel Goldman (who controlled the Debtor), weeks before the Debtor would default on $800 million in bond obligations. This "release" was the final step in a scheme to funnel the Debtor's assets to Silberstein for debts that *Goldman* (not the Debtor) owed him. During their depositions both men were completely transparent about this. In Silberstein's own words: "Goldman told me that **in order [to] release me . . .** it has to be in a way of a loan." The reason it "had to be" a loan was to shroud the payment to Silberstein from the scrutiny of Goldman's creditors, especially the bondholders.

Thus, Silberstein received millions, Goldman made good on his promises to his friend, and the Debtor was left holding the bag having received nothing in return at a time when it was indisputably insolvent. The "release" is therefore a classic fraudulent transfer, voidable under both New York and the United States Bankruptcy Code. Given these undisputed facts, Plaintiff is entitled to summary judgment on Counts I, III, and IV of its Amended Adversary Complaint.

## FACTUAL BACKGROUND

The facts relevant to this motion are contained in the accompanying Statement of Undisputed Material Facts pursuant to Rule 7056-1 of the Local Bankruptcy Rules for the Southern District of New York (*"SOF"*)[1] as supported by the Ravid Decl., the Silvestri Decl., and the exhibits thereto.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *In re Residential Cap.*, 533 B.R. 379, 395 (Bankr. S.D.N.Y. 2015). While the movant bears the initial burden of satisfying the material elements of its claim, upon such showing, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (quoting FED. R. CIV. P. 56(e)); *Western World Ins. v. Stack Oil*, 922 F.2d 118, 121 (2d Cir. 1990) ("the non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."). Here, there can be no genuine dispute as to Defendant's breach of the promissory note and the fraudulent nature of the "release."

---

[1] Capitalized terms not used otherwise defined herein are the same as those in the SOF.

This partial summary judgment motion concerns Plaintiff's central breach of contract claim (Count I) and two constructive fraudulent transfer theories regarding the "release" (Counts III and IV). That leaves two claims that are not the subject of this motion: Count II, which alleges the release was an *actual* fraudulent transfer, and Count V, which alleges an alternative fraudulent transfer claim regarding the Note itself.

This Court is permitted to enter partial summary judgment orders in an adversary proceeding as to non-core proceedings or in core proceedings as to which the bankruptcy court may not enter final orders or judgments absent consent. *See In re Trinsum Grp., Inc.*, 467 B.R. 734, 739–41 (Bankr. S.D.N.Y. 2012); (explaining that partial summary judgment orders are interlocutory and that "after *Stern v. Marshall*, the ability of bankruptcy judges to enter [such] interlocutory orders . . . has been reaffirmed.") (collecting cases); *see also In re Chateaugay Corp.*, 922 F.2d 86, 90 (2d Cir. 1990) (partial summary judgment orders are generally regarded as interlocutory). However, Plaintiff recognizes that one possible outcome of this motion is that the Court effectively resolves all issues in this case. Depending on the Court's decision, it is therefore possible that the entry of proposed findings of fact and conclusions of law may ultimately be required. *See In re Trinsum Grp., Inc.*, 467 B.R. 734.

## ARGUMENT

**I.   PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON COUNT I**

Count I asserts a breach of contract claim against Silberstein for his failure to repay the Note. SOF ¶ 1; Complaint ¶¶ 18–22. The familiar elements of a breach of contract under New York law are "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." *Ralusa, Inc. v. 1101 43rd Ave.*, 2015 WL 7348963, at *3 (N.Y. Sup. Ct. N.Y. Cty. Nov. 20, 2015) (quoting *Noise in The Attic Prods. v. London Records*, 10 A.D.3d 303, 306-07 (1st Dep't 2004)); *AGFA Photo USA v. Chromazone, Inc.*, 82 A.D.3d 402,

403 (1st Dep't 2011). Here, there is no question of material fact as to each of those elements which are undisputed and corroborated by documentary evidence.

The Note is a valid and existing contract, a copy of which was attached to the Complaint and included in the Ravid Declaration. Complaint Ex. A; SOF ¶¶ 3–5; Ravid Decl. Ex 2. Silberstein admits he executed the Note, and that the notarized signature on the Note is his. Complaint Ex. A; SOF ¶ 3; Silberstein Dep. 93:18–94:7 ("I executed it.").

The Debtor performed under the Note by distributing the $3,350,000 to Silberstein's bank account on March 21, 2018, the effective date of the Note. SOF ¶ 5. The Debtor's general ledger from March 21, 2018, reveals a transfer of over $3,350,000 from a bank account belonging to All Year Holdings LLC to Silberstein at one of his bank accounts ending in -1528. *Id*. Silberstein confirmed that the account ending in -1528 that received the Debtor's funds belonged to him. *Id*. Goldman similarly confirmed during his deposition that "All Year gave [Silberstein] a loan." *Id*. Silberstein did not deny receiving those proceeds during his deposition testimony. *Id*.

Silberstein breached the Note by failing to repay it despite demand following maturity on March 30, 2019. SOF ¶¶ 6–9. Silberstein does not dispute that he failed to repay the Note, instead he believes he is not under any obligation to repay it. For the reasons discussed below, he is wrong—but for the purposes of Plaintiff's *prima facie* breach of contract case, Silberstein's failure to repay the Note is conclusively established.

Finally, the Debtor was damaged by Silberstein's failure to repay the Note, in the amount of, as of the date of this filing, $6,834,000.97, plus all after-accruing interest, which accrues at a per diem rate of $1,488.89 pursuant to the Note's 16% interest rate. SOF ¶¶ 8–9. Pursuant to the terms of the Note, Silberstein waived "presentment for payment, notice of dishonor, protest, and notice of protest." SOF ¶ 3; Ravid Decl. Ex. 2.

Given the undisputed facts and documentary evidence regarding the execution, distribution and failure to repay the Note, Plaintiff is entitled to, at a minimum, a finding that the *prima facie* elements of its breach of contract claim are established.

## II. PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON COUNTS II AND IV

Counts II and IV of the Complaint attack the "release" that Goldman executed on October 1, 2020 and the accompanying 2020 Agreement as fraudulent transfers under two theories. Count II alleges that the "release" and the 2020 Agreement are constructive fraudulent transfers under 11 USC § 548(a)(1)(B). Count IV alleges that they are also fraudulent transfers under N.Y. Debtor & Creditor Law § 273. SOF ¶ 1; Ravid Decl. Ex. 1.

### A. The Release and 2020 Agreement Are Fraudulent Under § 548(a)(1)(B)

Section 548(a)(1) sets out the test for determining whether a transfer is subject to avoidance. In relevant part, the threshold elements to avoid a transfer are that: (1) there must be a "transfer of an interest of the debtor in property"; and (2) the transfer must be made within two years before the date of the filing of the bankruptcy petition. Both the 2020 Agreement and the "release" meet these requirements.

Section 101(54) of the Bankruptcy Code defines "transfer" as including "each mode, direct or indirect, absolute or conditional, voluntary or involutory, of disposing of or parting with property or an interest in property." 11 USC § 101. Therefore, a purported release of the Debtor's rights to a multi-million-dollar obligation from Silberstein is a "transfer of an interest" under § 548. *See In re Teligent, Inc.*, 325 B.R. 81, 86 (Bankr. S.D.N.Y.) ("[T]he broad definition of "transfer" is sufficiently robust to cover the release of an obligation to pay money."). Other bankruptcy courts examining releases under § 548 have reach the same conclusion as this Court. *See In re Fleming Packaging Corp.*, No. 03-82408, 2005 WL 2205703, at *13 (Bankr. C.D. Ill. Aug. 26, 2005) ("A release is a transfer of an interest of the debtor in property and is subject to avoidance

as a preferential or fraudulent transfer."); *In re e2 Communications, Inc.,* 320 B.R. 849, 855–56 (Bankr. N.D. Tex. 2004) (describing how courts have repeatedly held that a cause of action is property of the estate and a release of such cause of action constitutes a "transfer" of such property). Given that the release is a "transfer" "of property," the only threshold question under § 548 that remains is whether this transfer occurred two years prior to the Debtor's petition date. The Debtor filed its bankruptcy petition on December 14, 2021. SOF ¶ 62. October 1, 2020, the date of both the "release" and the 2020 Agreement, is within two years of the petition date. With those threshold questions answered in the affirmative, the Court next considers the fraudulent nature of the transfer of property.

A transfer or obligation is deemed fraudulent under 11 USC § 548(a)(1)(B), regardless of the Debtor's intent, if the Debtor received "less than a reasonably equivalent value in exchange for such transfer or obligation," and, in relevant part, if "the debtor was insolvent on the date that the transfer was made, or became insolvent as a result of the transfer." 11 USC §§ 548(a)(1)(B)(i), (ii)(I). Here, the Debtor received ***nothing*** in exchange for the release of Silberstein at a time when it was indisputably insolvent and on the eve of defaulting on $800 million in bond obligations.

> ### *i.*     ***The Debtor Never Owed Silberstein Anything***

The 2020 Agreement purports to establish a mutual release of obligations between Silberstein and Goldman for disputes between the two dating back to 2012. SOF ¶¶ 38–44; Silvestri Decl. Ex. 7. Both Silberstein and Goldman explained that these disputes concerned money Goldman owed Silberstein for four real estate deals: (1) the "Albee Square" deal, (2) the "North Flats" deal, (3) the "Long Island City" deal, and (4) the "19 Kent" deal. SOF ¶ 20. All four of those deals began in 2012–2013. *Id.* (Goldman Dep. 25:19–21) ("Were you doing business with Mr. Silberstein before the Debtor was formed. **Definitely**.") (emphasis added). Silberstein's email records concerning those deals confirm this timeframe. SOF ¶ 14; Silvestri Decl. Grp Ex.

-6-

5. This timing is critical, because the Debtor did not exist until September 17, 2014, *i.e.*, after Silberstein and Goldman began working on these four real estate projects. SOF ¶ 15.

Regarding their business together in 2012, both Silberstein and Goldman explained multiple times that they were doing business on an individual basis. SOF ¶ 19; Silberstein Dep. 65:14–16 ("In your mind, you're dealing with Yoel Goldman, and that's it? That is correct."). This makes sense, given their close friendship since 1997 when the two men met at yeshiva. SOF ¶¶ 10–11. As detailed below, the existence of any contractual obligations flowing from Goldman to Silberstein is suspect in its own right. SOF ¶¶ 16–22. The two never wrote anything down and Silberstein nor any entity he controlled was ever granted rights in or title to any properties. SOF ¶ 21. But setting that aside, any contractual obligations Goldman owed Silberstein for real estate projects in 2012 were not the Debtor's obligations because those oral agreements would predate the Debtor's corporate existence, and because the two men were dealing with each other on a strictly individual basis. SOF ¶¶ 19–23.

With the exception of the Note, there are no written real estate agreements (or agreements of any kind) between the Debtor and Silberstein. SOF ¶ 22. There are additionally no written agreements whatsoever between Goldman and Silberstein. SOF ¶¶ 16–22. This was intentional—Goldman insisted to Silberstein that they keep their dealings off the books. SOF ¶ 17. Silberstein even protested that he was losing track of the money exchanged between them, but still no written agreements were ever signed between the two. SOF ¶¶ 18, 20–22. Despite there being no written contracts, either between Silberstein and Goldman or Silberstein and the Debtor, Silberstein insists he was entitled to "shares" of Goldman's real estate investments in Albee Square, the North Flats, Long Island City, and 19 Kent. SOF ¶ 24. Silberstein admits that he never held title or interest in any of those properties through any written instrument. SOF ¶ 17. This was all, according to him, through hand shake oral agreements. *Id.* Silberstein Dep. 42:5–11 ("Title to the property wasn't

under your name? That is correct. So how was your 50 percent ownership documented? I was in agreement with Mr. Goldman, the same as, like. Others, the other buildings."). Finally, there are no agreements—none—in which the Debtor assumed any of Goldman's hand shake promises to Silberstein. SOF ¶ 23. Those obligations, to the extent they even existed, would instead lie at Goldman's ownership level for these properties as opposed to the Debtor's.

Despite the fact that these two men never once wrote anything down, two written documents have conveniently emerged in this case, both provided by Goldman or Silberstein in response to this lawsuit: the 2015 Agreement and the 2020 Agreement. SOF ¶¶ 24–29; 38–44. These agreements, purportedly drafted three years and eight years after the alleged hand shake promises between Goldman and Silberstein only exist in photographs. SOF ¶¶ 25, 42. Neither Goldman nor Silberstein have the original copies of these documents, and each of them vaguely asserted that the other had the originals. SOF ¶¶ 27–28 (neither man has the original 2015 Agreement); SOF ¶¶ 40–41 (neither man has the original 2020 Agreement). Accordingly, it is far from clear that the 2015 Agreement and the 2020 Agreement even meet the threshold standard for evidence that can be considered on summary judgment. *Crawford v. Dep't of Investigation*, 324 F. App'x 139, 143 (2d Cir. 2009) (affirming award of summary judgment in favor of defendant, where plaintiff presented testimony from uncorroborated source, as well as "speculation, hearsay and other inadmissible rumor, and conclusory allegations"); FED. R. CIV. P. 56(e)(1). However, even assuming the 2015 and 2020 Agreements are authentic, they are nonetheless ineffective to establish that the Debtor itself owed Silberstein any obligations.

The 2015 Agreement purports to document a then-ongoing dispute between Goldman and Silberstein. SOF ¶¶ 25, 29. Specifically, it states that Silberstein was owed "shares" of particular real estate properties, but that Silberstein could also demand "$3,250,000" from Goldman as compensation. *Id.* According to the 2015 Agreement, Goldman's obligation to pay Silberstein

arose from the Albee Square, North Flats, Long Island City, and 19 Kent projects. SOF ¶ 25. There is nothing connecting Goldman's promises to Silberstein, whatever they might have been, to the Debtor. Instead, Silberstein relies exclusively on the fact that Goldman allegedly signed the 2015 Agreement on behalf of himself and All Year entities. This is despite the fact that there are no agreements in which the Debtor assumed any of Goldman's obligations to Silberstein. SOF ¶ 24. Moreover, the 2015 Agreement lumps Goldman individually and each of his All Year entities into one defined term: "Party A." SOF ¶ 25; Silvestri Decl. Ex. 6. The 2015 Agreement does not distinguish which of these obligations belongs to which entity. SOF ¶ 25; Silvestri Decl. Ex. 6. It, like Silberstein, instead treats everything essentially being Goldman himself. Accordingly, the 2015 Agreement cannot raise a question of material fact regarding obligations the Debtor owed to Silberstein. At best, the 2015 Agreement merely establishes what Silberstein and Goldman confirmed during their depositions: that Goldman owed Silberstein money for his work on four real estate deals from 2012–2013.

### ii. *Goldman Pays Off Silberstein with the Debtor's Funds*

After three years after the alleged execution of the 2015 Agreement Goldman had not paid Silberstein. SOF ¶ 30. In 2018, Silberstein started to pressure Goldman to do something about what he felt he was owed. SOF ¶¶ 30. That was when Goldman came up with the idea to use the Debtor's funds to pay Silberstein and to structure the transaction as a promissory note to the Debtor. SOF ¶ 31. As Silberstein testified during his deposition:

> Goldman told me that **in order he should release me something**, it has to be in a way of a loan until we straighten things out with my percentage.

SOF ¶ 32; Silberstein Dep. 113:18–21 (emphasis added). According to Silberstein, this was actually his money he was owed from Goldman:

> In my mind, it was basically my money that he gave me in a loaned way, but . . . it was never actual loan. When we settled it, [Goldman]

-9-

> bolded out that, look, you have officially a loan from me. I said, the
> loan is my money.

SOF ¶ 33; Silberstein Dep. 170:7–12. The reason that Goldman structured it as a promissory note is obvious to those familiar with Goldman's business and history with the Debtor. Goldman used the Debtor's funds to satisfy promises he made to his close friend years ago. He structured it as a note so that the millions he was diverting to his friend would not raise any red flags in the Debtor's finances, as the note would be accounted for with a commensurate right to receive the money with interest. But, as Silberstein explained, that was never the plan. SOF ¶¶ 30–33. Instead, Goldman would "release" him from the promissory note later. SOF ¶ 32.

### iii. *Two Years Later Goldman Releases Silberstein from the Note*

Goldman does not appear to have ever sought to enforce the Note after it matured on March 30, 2019. It was only after the Debtor filed its bankruptcy petition and the appointment of new executive leadership that demands on the Note were issued. SOF ¶ 7. Once Plaintiff filed suit seeking to enforce the Note, a second document conveniently emerged: the 2020 Agreement and "release." The 2020 Agreement shares all the evidentiary flaws of the 2015 Agreement. It is translated from hand written Hebrew from a photograph, and no one can seem to remember where the original is. SOF ¶¶ 38–41. Nevertheless, the 2020 Agreement and the accompanying "release" purport to release Silberstein from the Note in exchange for Silberstein releasing the Debtor from all the obligations it allegedly owed to him. SOF ¶ 38; Silvestri Decl. Ex. 7. However, as detailed above, the Debtor **never owed Silberstein anything** for the Albee Square, the North Flats, the Long Island City, or the nineteen Kent deals. The 2020 Agreement is simply a continuation of the same farce on display in the 2015 Agreement, camouflaging Goldman's promises to his friend Silberstein as the Debtor's obligations. Silberstein, on the other hand, *did* legitimately owe the Debtor millions of dollars under the duly executed and enforceable Note. Therefore, the "release" under the 2020 Agreement represents a transfer of millions of dollars from the Debtor in exchange

for nothing whatsoever. There can be no question of material fact that something-for-nothing qualifies as "less than reasonably equivalent value" under § 548.

### *iv. The Debtor Was Indisputably Insolvent on October 1, 2020.*

The last element of Plaintiff's constructive fraudulent transfer claim under § 548 is whether the less-than-reasonably-equivalent-value transfer took place when either the debtor was insolvent or became insolvent. 11 USC §§ 548(a)(1)(B)(i), (ii)(I)–(II). Section 548 does not define the term "insolvent," but 11 USC § 101(32) generally defines the term (for entities other than partnerships) to mean that the sum of the debtor's total debts exceeds total property "at a fair valuation," excluding property transferred or concealed with the intent to hinder, delay or defraud creditors and certain exempt property. 11 USC § 548(a)(1)(B)(ii)(I) ; § 101(32) . This test is called the "balance sheet" test because the test matches the debtor's property values against debts on the relevant date. *In re Lyondell Chem. Co.*, 567 B.R. 55, 109 (Bankr. S.D.N.Y. 2017), aff'd, 585 B.R. 41 (S.D.N.Y. 2018). Here, the Debtor's insolvency on October 1, 2020 is beyond dispute.

The Debtor's internal financial records reveal that it was insolvent or about to become insolvent on October 1, 2020 due chiefly to material defaults on hundreds of millions of dollars in loans. SOF ¶¶ 51–61. According to the Debtor's September Financials, as of September 30, 2020, *i.e.*, one day before Goldman would release Silberstein from the Note:

> [T]he Company has not closed sales and refinancing transactions and has not repaid liabilities, the payable date of which has passed. This gives the lenders grounds for immediate repayment of the full debts of the Company thereto, and gives the holders of the Debentures (Series B, C, D and E) the grounds to call for immediate repayment of the full balance of the Debentures. **In the opinion of the Board of Directors of the Company and the management thereof, there are material doubts with regard to the continued existence of the Company as a going concern in the near future.**

SOF ¶ 52; Ravid Decl. Ex. 4 (WIND DOWN000003) (emphasis added). The September Financials contain an extensive "Note 2" which discusses several "[m]aterial doubts in respect of

the continuation of the Company as a going concern." SOF ¶ 52: Ravid Decl. Ex. 4 ((WIND DOWN000015). Among other things, Note 2 discusses "non-payment of liabilities," including defaults defaults under $32 million of Series B bonds, under $646 million of Series B, C, D, and E bonds, under a $65 million mezzanine loan, under a $55 million "Smith" loan, and under a $39 million referred capital investment agreement defaults. *Id.*

According to Goldman, as of October 1, 2020, the Debtor was going to default on its bonds unless it closed "very large transactions" and received a "huge influx of money" (which it did not) SOF ¶ 49. Goldman characterized this time period as a "crisis with the company." SOF ¶ 50. Less than two months later, on November 29, 2020, the Debtor published that it was unable to make payment obligations on approximately $800 million in bonds, the chief event that precipitated its eventual bankruptcy filing. SOF ¶ 48. Shortly after the Debtor defaulted on its bond obligations on November 29, 2020, it engaged in extensive negotiations with its creditors and other constituents to explore restructuring options, given that it was unable to service its debt at the time. SOF ¶ 46. During this period, which was prior to the Debtor's bankruptcy filing, the Debtor's Board of Directors negotiated with Goldman to loosen his control of the Debtor. These steps were taken after Goldman had previously taken control of the board and authorized the Debtor to make payments on obligations that he had also personally guaranteed. SOF ¶ 47.

In addition to the notes to the September Financials, a review of the Debtor's internal financial records confirms that in in October and November of 2020, its debts exceeded its assets. SOF ¶¶ 56–61. This is because the September Financials relied on artificially inflated assets, including a $36 million cash asset entry without a corresponding liability. SOF ¶ 58. As this Court is aware, subsequent investigation by Assaf Ravid pursuant to Bankruptcy Rule 2004 has revealed that beginning in 2019 the Debtor's cash position was being artificially inflated by an unauthorized line of credit that Goldman opened with UBS Bank that, without the board's knowledge or consent,

was secured by a senior lien on cash proceeds of the sale of the Debtor's property. SOF ¶¶ 58–59. The Debtor did not have the funds to repay this line of credit with UBS Bank and Goldman eventually engaged in additional unauthorized borrowing, backed by confessions of judgment, to repay the line of credit. SOF ¶ 60. Additionally, the September Financials further inflated assets by including a rent receivable asset of $17.8 million, the collection of which was uncertain at the time. SOF ¶ 57.

Thus, the balance sheet for the Debtor as of September 30, 2020 was itself out of balance, which, combined with the fact that the Series B–E bondholders were in a position to demand full repayment on hundreds of millions of dollars in loans, conclusively resolves all questions of fact surrounding the Debtor's insolvency as of October 1, 2020. All of this evidence taken together further resolves any question of material fact surrounding the Debtor's existing or imminent insolvency when Goldman "released" Silberstein from the millions he owed the Debtor under the Note. Accordingly, both the 2020 Agreement and the "release" that accompanied it represent fraudulent transfers, void under § 548, and therefore these documents cannot, as a matter of law, establish a defense to Plaintiff's breach of contract claim.

**B.     The Release and 2020 Agreement Are Fraudulent Under N.Y. Debtor & Creditor Law § 273**

Similar to Count II, Count IV of the Complaint attacks the 2020 Agreement and "release" as fraudulent transfers under N.Y. Debtor & Creditor Law § 273. To obtain summary judgment on a § 273 claim, a plaintiff must resolve all questions of material fact that: (1) the debtor made the transfer "without receiving a reasonably equivalent value in exchange for the transfer," and (2) "was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business transaction." N.Y. DEBTOR & CREDITOR LAW § 273.

In 2019, New York enacted the Uniform Voidable Transactions Act (*"UVTA"*). The UVTA amended and repealed certain portions of the Debtor Creditor Law, including § 273, but the amended § 273 does not apply to transfers made before April 2020. Here, the release took place after the effective date of the UVTA, and therefore the amended § 273 applies. Given the recent amendments, case law interpreting amended § 273 is not yet well developed, but courts appear to interpret the test under amended § 273 according to its plain and ordinary meaning. *See 245 E. 19 Realty LLC v. 245 E. 19th St. Parking LLC*, 80 Misc. 3d 1206(A), 194 N.Y.S.3d 923 (N.Y. Sup. Ct. 2023) (finding that allegations that a company drained of its funds on a daily basis stated a claim that it was left with "unreasonable small remaining assets" under amended § 273). Additionally, Bankruptcy Courts have observed that the "[t]he relevant elements of § 273 mirror the relevant elements of § 548(a)(1)(B), and the Court's reasoning, above, is equally applicable." *In re Martino*, 652 B.R. 416, 422 (Bankr. E.D.N.Y. 2023) (interpreting amended § 273); *In re Molina*, 657 B.R. 172, 190 (Bankr. E.D.N.Y. 2023). ("The relevant elements of NYDCL § 273(a)(2) largely mirror the elements of § 548(a)(1)(B), and the Court's reasoning . . . with respect to . . . § 548(a)(1)(B) is equally applicable.") (same).

Thus, the analysis above regarding the something-for-nothing nature of the 2020 Agreement and release under § 548 applies equally to Plaintiff's § 273 claim. As discussed above, the 2020 Agreement and "release" represent a gift from Goldman to Silberstein of millions of dollars. The Debtor received nothing in return for that gift, because Silberstein could never have enforced Goldman's promises to him in 2012 against the Debtor as a transactional party. The same is true for § 273 "unreasonably small assets" test. As established above and by the Debtor's undisputed corporate records, in October 1, 2020, the Debtor was staring down the barrel of a massive default on its loan obligations that caused its board of directions to question its viability as a going concern. Two months later it would in fact default on $800 million in bonds, an event

that precipitated its filing a chapter 11 petition in December 2021. As detailed above, the Debtor's internal financials at that time reveal that it was unable to pay its hundreds of millions of dollars in debt obligations. The financial walls were closing in, a fact which no doubt weighed in Goldman's mind as he saw to protect his friend from the note he had insisted Silberstein sign.

For this additional reason, both the 2020 Agreement and the "release" that accompanied it represent fraudulent transfers, which are void under § 273, and therefore cannot establish a defense to Plaintiff's breach of contract claim against Silberstein.

## Conclusion

For the reasons stated above, Plaintiff respectfully requests that the Court grant Plaintiff partial summary judgment on Counts I, II, and IV of its Amended Adversary Complaint, awarding thereon in the amount of $6,834,000.97, plus all after-accruing interest, and for any other relief as the Court deems just and proper.

Dated: August 16, 2024

                                          Respectfully submitted,

                                          CHAPMAN AND CUTLER LLP

                                          By: _____
                                                   Eric Silvestri

Eric Silvestri (admitted *pro hac vice*)
CHAPMAN AND CUTLER LLP
320 South Canal
Chicago, Illinois  60606
(312) 845-3000
silvest@chapman.com