**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 11 |
| ALL YEAR HOLDINGS LIMITED, ) | |
| ) | |
| Debtor, ) | Bankruptcy Case No. 21-12051 (MG) |
| ) | |
| ) | |
| AYH WIND DOWN LLC, THROUGH OFER ) | |
| TZUR AND AMIR FLAMER, SOLELY IN THEIR ) | |
| JOINT CAPACITY AS CLAIMS ) | |
| ADMINISTRATOR, ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary No. 23-01180-mg |
| ) | |
| YOEL SILBERSTEIN, ) | |
| ) | |
| Defendant. ) | |

**LOCAL BANKRUPTCY RULE 7056-1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I, II, AND IV OF THE AMENDED COMPLAINT**

Pursuant to Local Bankruptcy Rule 7056-1(b), AYH Wind Down LLC (*"Plaintiff"* or *"Wind Down Co."*), through Ofer Tzur and Amir Flamer jointly as Claims Administrator, submits this statement of the material facts as to which there is no genuine issue to be tried, in support of its motion for summary judgment against defendant Yoel Silberstein (*"Defendant"* or *"Silberstein"*) on Counts I, II and IV of the Amended Complaint.

**THE PARTIES**

1. The Plaintiff in this matter is Wind Down Co., through Ofer Tzur and Amir Flamer, solely in their joint capacity as Claims Administrator, under All Year Holdings Ltd.'s (the

"Debtor") confirmed Third Amended Chapter 11 Plan of Reorganization[1] (the "Plan") and that certain Plan Administration Agreement executed in conjunction with the effectiveness of the Plan (the "Plan Administration Agreement"). Declaration of Assaf Ravid (the "Ravid Decl.") ¶ 1, Ex. 1 (copy of the Complaint)[2] at ¶¶ 1–7; Answer[3] ¶¶ 1–7.

2. Defendant Yoel Silberstein is an individual. Complaint ¶ 8; Answer ¶ 8.

**SILBERSTEIN BORROWS $3,350,000 AND FAILS TO REPAY IT**

3. On March 21, 2018, Silberstein executed a promissory note in the principal amount of $3,350,000 (the "Note") in favor of Debtor. Complaint ¶ 12; Ravid Decl. ¶ 11, Ex. 2 (copy of the Note); Silberstein Dep. 93:18–94:7.[4]

4. Silberstein executed the Note both in his personal capacity and on behalf of a limited liability company he used to hold title to his primary residence called JS Skillman NY LLC. Ravid Decl. Ex. 2 (Note) at p. 1; Silberstein Dep. 74:8–77:5.

5. On or about March 21, 2018, and pursuant to the Note, the Debtor distributed over $3,350,000 from a bank account belonging to the Debtor to Silberstein at one of his bank accounts ending in -1528. Ravid Decl. ¶ 12; Ex. 3; Silvestri Decl. ¶ 5, Ex. 3;[5] Silberstein 94:23–95:6; Goldman Dep. 33:11–12.[6]

---

[1] *See In re All Year Holdings Limited*, Case No. 21-12051 (MG) (the "Main Case"), ECF No. 352.

[2] The Amended Adversary Complaint ("*Complaint*") is attached as Exhibit 1 to the Ravid Decl.

[3] The Answer to Amended Adversary Complaint ("*Answer*") is attached as Exhibit 1 to the Declaration of Eric Silvestri (the "*Silvestri Decl.*").

[4] Excerpts of the Deposition of Yoel Silberstein are attached as Exhibit 2 to the Silvestri Decl.

[5] A true and correct copy of email correspondence from Silberstein's counsel confirming Silberstein owns the Chase account ending in -1528 is attached as Exhibit 3 to the Silvestri Decl.

[6] Excerpts of the Deposition of Yoel Goldman are attached as Exhibit 4 to the Silvestri Decl.

6. By its terms, the Note matured on March 30, 2019, with interest computed at an annualized rate of sixteen percent. Ravid Decl. ¶ 13; Ex. 2.

7. On March 30, 2022, Debtor, through its attorneys, issued written demand to Silberstein that he remit the full amount owed under the Note to the Debtor. Complaint ¶ 15; Ravid Decl. ¶ 14; Silberstein Dep. 98:18–100:4.

8. Interest has continued to accrue since the March 30, 2022, demand and, as of August 16, 2024, the amount owed under the Note is no less than $6,834,000.97, consisting of $3,350,000 of outstanding principal and $3,484,000.97 in outstanding interest. Interest will continue to accrue at a per diem rate of $1,488.89. Ravid Decl. ¶ 16.

9. As of the date of this filing, Silberstein has failed to remit any payment whatsoever on the Note. Ravid Decl. ¶ 15.

### SILBERSTEIN'S HISTORY WITH YOEL GOLDMAN

10. Silberstein was close personal friends with Mr. Yoel Goldman (*"Goldman"*) beginning when the two met at yeshiva in 1997, and Silberstein considers Mr. Goldman a "close" friend if not his best friend. Silberstein Dep. 25–28; 47:22–48:13.

11. Silberstein and Goldman studied together, got married at the same location, and stayed very close. Silberstein Dep. 33:1–8.

12. Silberstein entered the real estate business in 2002, which was and is his primary source of income. Silberstein Dep. 32:1–8; 36:1–21.

13. Silberstein describes his real estate activity as "syndicate" work in which he "wheels and deals whereover he can to make money," "working with management and negotiations on deals," and "bringing in investors." Silberstein Dep. 28:1–25.

14. By 2012, Silberstein and Goldman had begun working on real estate deals together. Silberstein Dep. 73:16–24; 186:2–187:19; 190:4–12; Silvestri Decl. Grp. Ex. 5.[7]

15. In 2012, Goldman had not yet formed All Year Holdings, Ltd (the *"Debtor"*), the Debtor in the main Bankruptcy Case. The Debtor was eventually established and incorporated on September 17, 2014. Ravid Decl. ¶ 19.

16. The two men frequently borrowed money from one another as part of their real estate "deals" without any written records, agreements, or ledgers memorializing the obligations. Silberstein Dep. 53:25–56:13; 57:6–58:5; Goldman Dep. 22:23–23:25.

17. Silberstein claims these real estate deals involved him being granted "equity" in properties, but no right or title to such property was ever held in his name nor in the name of any entity he controlled. Silberstein Dep. 42:3–44:22.

18. Silberstein protested this arrangement to Goldman, but Goldman insisted on keeping it off the books and not written down or recorded. Silberstein Dep. 57:18–58:5.

19. Silberstein and Goldman did business as individuals and conceived of their business as being with each other on an individual basis. Silberstein Dep. 65:14–24; Silberstein Dep. 204:19–25; Goldman Dep. 37:20–21.

20. Four of Silberstein's real estate deals with Goldman that arose between 2012–2013 were referred as: (1) the "Albee Square" deal, (2) the "North Flats" deal, (3) the "Long Island City" deal, and (4) the "19 Kent" deal. Silberstein Dep. 50:3–21; 58:19–59:61; Goldman Dep. 25:9–21.

21. In keeping with how Silberstein and Goldman did business, these four real estate deals were not contemporaneously memorialized in any written agreements or contracts and Silberstein did not own title to any portion of these properties. Silberstein Dep. 57:6–61:25.

---

[7] Emails from 2012 and 2013 documenting Silberstein's real estate work are attached as Group Exhibit 5 to the Silvestri Decl.

22. Other than the Note, there are no written real estate agreements (or agreements of any kind) between the Debtor and Silberstein. Ravid Decl. ¶ 17.

23. There are no agreements in which the Debtor assumed any of Goldman's obligations to Silberstein. Ravid Decl. ¶ 18.

**SILBERSTEIN DEMANDS COMPENSATION FROM GOLDMAN IN 2015**

24. By 2015, Silberstein believed Goldman owed him compensation for his work on the Albee Square, North Flats, Long Island City, and 19 Kent deals. According to Silberstein, the form of that compensation was supposed to be "shares" in those deals. Silberstein Dep. 79:5–10; 108:6–25; Goldman Dep. 39:17–24.

25. Silberstein produced in discovery an English translation of a photograph of a handwritten document, dated November 23, 2015, written in Hebrew, that he claims to have executed alongside Goldman that memorialized their dispute in 2015 (the *"2015 Agreement"*).[8]

26. The English translation of the purported 2015 Agreement was provided by Goldman to Silberstein after Silberstein learned of this lawsuit. Silberstein Dep. 130:7–23.

27. Silberstein does not possess the original copy of the purported 2015 Agreement. Silberstein Dep. 126:9–22.

28. Goldman does not possess the original copy of the purported 2015 Agreement. Goldman Dep. 46:2–47:5.

29. The 2015 Agreement states that Silberstein was owed "shares" of particular real estate properties, but that Silberstein could also demand $3,250,000 from Goldman as compensation. Silvestri Decl. Ex. 6 (2015 Agreement ¶ 5).

---

[8] An English translation of the 2015 Agreement is attached to the Silvestri Decl. as Exhibit 6.

## SILBERSTEIN AND GOLDMAN USE THE DEBTOR'S MONEY TO PAY OFF GOLDMAN'S DEBT TO SILBERSTEIN

30. By 2018 Goldman had not paid Silberstein and Silberstein told Goldman it was time to "get moving," that "things take longer than it should," and "I need some money … that he owed me." Silberstein Dep. 78:12–17; 96:16–21.

31. It was Goldman's idea to structure payment to Silberstein as a promissory note from Silberstein to the Debtor. Silberstein Dep. 78:4–79:10; Goldman Dep. 33:11–12; 34:2–9; 39:20–24.

32. Goldman told Silberstein that "in order he should release [Silberstein] something, it has to be in a way of a loan until [they] straighten things out with [Silberstein's] percentage." Silberstein Dep. 113:17–24.

33. According to Silberstein the loan proceeds were actually money that he was owed by Goldman. Silberstein Dep. 170:7–12.

34. Silberstein "discussed at that time" with Goldman that the loan proceeds from the Note were "basically [Silberstein's] money that's owed to [him]" for Silberstein's work on the Albee Square, North Flats, Long Island City, and 19 Kent deals that are mentioned in the 2015 Agreement. Silberstein Dep. 77:21–24; Goldman Dep. 34:2–15.

35. Sometime between 2012 and 2014, Silberstein formed JS Skillman NY LLC (*"Skillman LLC"*), a limited liability company whose members were Silberstein and his wife. Skillman LLC was used to hold title to Silberstein's primary residence. Silberstein Dep. 74:8–77:5.

36. Skillman LLC was a co-obligor on the Note, alongside Silberstein. Silberstein Dep. 77:16–17.

37. Even after forming Skillman LLC, Silberstein conceived his business with Goldman as strictly on an individual level. Silberstein Dep. 204:19–25.

## GOLDMAN "RELEASES" SILBERSTEIN AS THE DEBTOR DEFAULTS ON ITS $800 MILLION BOND OBLIGATION

38. Silberstein produced in discovery an English translation of a photograph of a handwritten document, dated October 1, 2020, written in Hebrew, that he claims to have executed alongside Goldman (the *"2020 Agreement"*),[9] which purports to further document their then-ongoing dispute regarding Silberstein's demand that Goldman compensate him for work performed on the Albee Square, North Flats, Long Island City, and 19 Kent deals. Silberstein Dep. 163:19–169:5.

39. The English translation of the purported 2020 Agreement was provided by Silberstein. Silberstein Dep. 163:17–165:23.

40. Silberstein does not possess the original copy of the purported 2020 Agreement. Silberstein Dep. 164:15–17.

41. Goldman does not possess the original copy of the purported 2020 Agreement, but he claims he had it before. Goldman Dep. 61:10–23.

42. Goldman provided only a photograph of the purported 2020 Agreement to the translation services to have it translated into English. Goldman Dep. 62:16–22.

43. The 2020 Agreement purported to "release" Silberstein of his obligations under the Note in exchange for Silberstein releasing claims against Goldman. Silvestri Decl. Ex. 7 (2020 Agreement ¶ b).

44. Silberstein produced in discovery a separate "release" alongside the 2020 Agreement.[10]

---

[9]  An English translation of the 2020 Agreement is attached to the Silvestri Decl. as Exhibit 7.

[10]  A copy of the Release is attached to the Silvestri Decl. as Exhibit 8.

## THE DEBTOR'S INSOLVENCY IN OCTOBER 2020

45. During the COVID-19 Pandemic the Debtor struggled to service its significant debt burden. Ravid Decl. ¶ 33.

46. Shortly after the Debtor defaulted on its bond obligations on November 29, 2020, it engaged in extensive negotiations with its creditors and other constituents to explore restructuring options, given that it was unable to service its debt at the time. Ravid Decl. ¶ 34.

47. During this period, which was prior to the Debtor's bankruptcy filing, the Debtor's Board of Directors negotiated with Goldman to loosen his control of the Debtor. These steps were taken after Goldman had previously taken control of the board and authorized the Debtor to make payments on obligations that he had also personally guaranteed. Ravid Decl. ¶ 34.

48. On November 29, 2020, the Debtor published that it was unable to make payment obligations on approximately $800 million in bonds. Ravid Decl. ¶ 31.

49. According to Goldman, as of October 1, 2020, the Debtor was going to default on its bonds unless it closed "very large transaction" and received a "huge influx of money." Goldman Dep. 82:18–23.

50. Goldman characterized this time period as a "crisis with the company." Goldman Dep. 32:3–35:8; 73:7–74:5.

51. The Debtor's records financial records reveal that the Debtor was insolvent or about to become insolvent on or around October 1, 2020, due in large part to payment defaults on hundreds of millions of dollars in loans. Ravid Decl. ¶ 20–21; Ex. 4.

52. The Debtor's unaudited condensed consolidated financial statements dated as of September 30, 2020 (the *"September Financials"*) contains an extensive "Note 2" which discusses several "[m]aterial doubts in respect of the continuation of the Company as a going concern." Ravid Decl. Ex. 4 at p. 3 of the Notes to the September Financials (WIND DOWN000015–27).

53. Note 2 contains several issues regarding the status of the Debtor as a going concern, including the "non-payment of liabilities," including defaults under $32 million of Series B bonds, under $646 million of Series B, C, D, and E bonds, under a $65 million mezzanine loan, under a $55 million "Smith" loan, and under a $39 million referred capital investment agreement defaults. Ravid Decl. ¶¶ 23–24 Ex. 4.

54. The September Financials further clarify that, because of the material doubts expressed in Note 2, that "the lenders [have] grounds for immediate repayment of the full debts of the Company thereto, and gives the holders of the Debentures (Series B, C, D and E) the grounds to call for immediate repayment of the full balance of the Debentures. In the opinion of the Board of Directors of the Company and the management thereof, there are material doubts with regard to the continued existence of the Company as a going concern in the near future." Ravid Decl. ¶ 25; Ex. 4.

55. In addition to the extensive discussion in Note 2 of the September Financials, a review of the Debtor's internal financial records confirms that in in October and November of 2020, its debts exceeded its assets. Ravid Decl. ¶ 26.

56. The September Financials further inflated assets by including a rent receivable asset of $17.8 million, the collection of which was uncertain at the time. Ravid Decl. ¶ 27; Ex. 4.

57. The September Financials are further inflated by the inclusion of $36,000,000 in cash assets for the Debtor without including a corresponding liability for that $36,000,000 in cash. Ravid Decl. ¶ 28; Ex. 4.

58. As to this $36,000,000 in cash, investigation has revealed that beginning in 2019 the Debtor's cash position was being artificially inflated by an unauthorized line of credit that Goldman opened with UBS Bank that, without the board's knowledge or consent, was secured by a senior lien on cash proceeds of the sale of the Debtor's property. Ravid Decl. ¶ 29.

59. The Debtor did not have the funds to repay this line of credit with UBS Bank and Goldman eventually engaged in additional unauthorized borrowing, backed by confessions of judgment, to repay the line of credit. Ravid Decl.¶ 30.

60. The Debtor eventually filed its chapter 11 bankruptcy petition on December 14, 2021. Ravid Decl. ¶ 32.

Dated: August 16, 2024
      New York, New York

_____
CHAPMAN AND CUTLER LLP
1270 Avenue of the Americas
New York, New York 10020
Telephone: (212) 655-6000
Michael Friedman
David T. B. Audley
Eric S. Silvestri

*Counsel to the Plaintiff*