**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------x

In re:                                                   <u>**NOT FOR PUBLICATION**</u>

    ALL YEAR HOLDINGS LIMITED,                   Chapter 11

                                  Debtor.   Case No. 21-12051 (MG)

---------------------------------------------------------------------x

AYH WIND DOWN LLC, through Ofer Tuzer and Amir
Flamer in their joint capacity as Claims Administrator,

                           Plaintiff,   Adv. Pro. No. 23-01180 (MG)

vs.

YOEL SILBERSTEIN,

                          Defendant.

---------------------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER DENYING
### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*A P P E A R A N C E S :*

CHAPMAN & CUTLER LLP
*Attorneys for AYH Wind Down LLC*
1270 Avenue of the Americas
New York, New York 10020
By:   Michael Friedman, Esq.
       David T. B. Audley, Esq.
       Eric S. Silvestri, Esq.

KUDMAN TRACHTEN ALOE POSNER LLP
*Attorneys for Yoel Silberstein*
488 Madison Avenue
23rd Floor
New York, New York 10022
By:   Paul H. Aloe, Esq.
       David N. Saponara, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the contested motion (the "Motion," ECF Doc. # 36) of AYH Wind Down LLC ("Wind Down Co." or "Plaintiff") through Ofer Tzuer and Amir Flamer, jointly in their capacity as Claims Administrator pursuant to All Year Holdings Limited's (the "Debtor") confirmed *Third Amended Chapter 11 Plan of Reorganization of All Year Holdings Limited* (the "Plan," Case No. 21-12051, ECF Doc. # 352-1 and the related disclosure statement, the "Disclosure Statement," Case No. 21-12051, ECF Doc. # 157).[1]  The Motion seeks partial summary judgment with respect to Counts I, II, and IV of the amended complaint[2] (the "Complaint," ECF Doc. # 27) filed against defendant Yoel Silberstein ("Silberstein" or "Defendant") in the above-captioned adversary proceeding (the "Adversary Proceeding") and Silberstein's related affirmative defenses.[3]  (Motion at 1.)  In support of the Motion, the Plaintiff submitted the following: (i) a statement of undisputed facts (the "Statement of Undisputed Facts" or "SUF," ECF Doc. # 37); (ii) the supporting declaration of Assaf Ravid, the Plan Administrator of the Plaintiff (the "Ravid Decl.," ECF Doc. # 38); and (iii) the supporting declaration of Eric Silvestri, counsel to the Plaintiff (the "Silvestri Decl.," ECF Doc. # 39).

---

[1]  Unless otherwise indicated, docket references shall refer to those in the above-captioned adversary proceeding.  Additionally, defined terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.  Copies of the Plan and Disclosure Statement are also included as Exhibits H and I to the Aloe Decl. (as defined herein), respectively.

[2]  The Complaint amends and supersedes the initial complaint filed on September 19, 2023 (the "Initial Complaint," ECF Doc. # 1), the latter of which contained, at the time, only one cause of action for breach of the Note (defined below) that is identical to Count I of the Complaint.  (*Compare* Initial Complaint ¶¶ 18–22 *with* Complaint ¶¶ 18–22.)

[3]  The Motion, in certain instances, indicates that it seeks summary judgment with respect to Count III of the Complaint as opposed to Count II.  (*See, e.g.*, Motion at 2 (arguing that Plaintiff is entitled to summary judgment on "Counts I, III, and IV of [the Complaint]."); *id.* at 3 (stating that the Motion concerns Counts I, III, and IV, which "leaves two claims that are not the subject of this [M]otion: Count II . . . and Count V.").)  However, as the balance of the Motion and parties' subsequent submissions make clear that summary judgment is being sought with respect to Count II of the Complaint and not Count III, the Court is proceeding accordingly.

Defendant opposes the relief sought, filing a response to the Motion (the "Opposition," ECF Doc. # 45) along with the supporting declarations of Silberstein (the "Silberstein Decl.," ECF Doc. # 42) and Paul H. Aloe, a member of Kudman Trachten Aloe Posner LLP and counsel to Defendant (the "Aloe Decl.," ECF Doc. # 43). In addition, the Defendant also filed a response to the Statement of Undisputed Facts (the "Defendant SUF Response," ECF Doc. # 44).

In connection with the foregoing, the Plaintiff filed two separate replies: (i) a reply to certain facts the Defendant included in its Opposition, asserting, among other things, that such facts are "procedurally improper" (the "Reply to Supplemental Facts," ECF Doc. # 46); and (ii) a reply in support of the Motion (the "Reply in Support of Motion," ECF Doc. # 47).

For the reasons discussed below, the Court **DENIES** the Motion.

## I.    BACKGROUND

The following facts, unless otherwise noted, are undisputed between the Plaintiff and the Defendant and/or are derived from supporting documentation as cited. *See* FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); FED. R. BANKR. P. 7056 (making Rule 56 of the Federal Rules of Civil Procedure applicable to adversary proceedings).

### A.  In General

The disputes at the heart of this Adversary Proceeding pertain to certain dealings between the Defendant and Yoel Goldman ("Goldman"), founder of the Debtor, and their respective entities. (*See* Defendant SUF Response ¶ 15 (indicating that the Debtor was incorporated in 2014); Aloe Decl., Ex. B at 24:20–22 (Goldman) (acknowledging that he founded the Debtor).) Silberstein and Goldman, whose friendship commenced in 1997, are close personal friends who

have worked on real estate deals together since 2012, prior to the Debtor's formation on

September 17, 2014.  (Defendant SUF Response ¶¶ 10–11, 14–15.)

As part of this relationship, Silberstein testified that he and Goldman "constantly had

dealings," which included Silberstein facilitating loans from other lenders as well as possibly

transferring his own money to Goldman.  (*See id.* ¶ 13; Aloe Decl., Ex. A at 54:11–17

(Silberstein) ("Q: You said Mr. Goldman constantly asked you for money?  A: Well, we

constantly had dealings.  One time we needed money over here, so I tried to facilitate and call

lenders to help him with a loan."); *id.* at 55:6–56:7 (Silberstein) (noting that while he could not

recall specific transactions at the time, it was "possible" that Silberstein transferred his personal

funds to Goldman as the individuals "had a close relationship, and [Silberstein] constantly helped

[Goldman] whatever [sic] [he] could").)  Goldman confirms that money may have passed

between the two individuals.  (*See id.*, Ex. B at 23:13–25 (Goldman) (responding to a question

regarding whether money passed between the two informally, Goldman acknowledged that

"[t]here was [sic] definitely transactions, but I don't remember if it was a straight-out loan, or [if]

it was just in the spirit of the business, or in the merit of the business long gone.").)  Any such

transactions, however, were done "[m]ost of the time" through "verbal agreements and

confirmation between [him and Goldman]."  (*Id.*, Ex. A at 57:6–22 (Silberstein).)

Among others, Silberstein and Goldman were involved in four real estate deals: (i) 436

Albee Square, Brooklyn, NY ("Albee Square"); (ii) 163 N. 6th Street, Brooklyn, NY ("North

Flats"); (iii) 41-21 28th Street, Long Island City, NY ("Long Island City"); and (iv) 19 Kent ("19

Kent").  (Defendant SUF Response ¶ 20; Silvestri Decl., Ex. 7 (specifying the New York City

borough for three of the four deals).)  While the parties dispute whether these deals "arose

between 2012–2013," Silberstein acknowledged that written documentation pertaining to these

four deals concerned obligations arising in 2012 or 2013.  (*Compare* Defendant SUF Response ¶

20 (denying the deals came about in 2012 through 2013) *with* Aloe Decl., Ex. A at 59:18–60:18

(Silberstein) (agreeing that the document "is not a contemporaneous memorialization of . . .

amounts that were owed" but rather "discusses obligations that were owed, for example, back in

2012 or 2013").)

### B.  The 2015 Agreement

In 2015, Silberstein believed Goldman owed him compensation for work performed in

connection with the Albee Square, North Flats, Long Island City, and 19 Kent deals.  (Defendant

SUF Response ¶ 24 (admitting the same); Aloe Decl., Ex. A at 108:6–10 (Silberstein) (indicating

that he signed the 2018 promissory note because he felt he was "already owed money from Mr.

Goldman"); *id.* at 115:12–14 (Silberstein) ("Q: . . . So as of March 21, 2018, again, according to

you, Mr. Goldman owes you $8 million; is that right?  A: Yes.").)  While Goldman concedes that

Silberstein believes he was owed such compensation, Goldman asserts that it was the Debtor

who was obligated to pay Silberstein as opposed to him.  (*See* Defendant SUF Response ¶ 24

(arguing that it was the Debtor and not Goldman who was to compensate Silberstein).  *But see*

*id.* ¶ 29 (denying that "Goldman was the ***only*** party obligated to pay Silberstein specified

amounts" (emphasis added)); Aloe Decl., Ex. B at 70:21–71:2 (Goldman) ("Q: I think you

testified earlier that it's your understanding that you still owe him money on one of those Kent

deals, right?  A: Maybe I still owe him some money on the three deals as well.  I don't remember

the amount.").)

During discovery, Silberstein produced an English translation of a handwritten Hebrew

document, dated November 23, 2015 (the "2015 Agreement," Silvestri Decl., Ex. 6), that

Silberstein maintains he and Goldman executed in 2015 to memorialize the dispute.[4]  (Defendant

SUF Response ¶ 25; Silberstein Decl., Ex. C (Hebrew version of the 2015 Agreement); Silvestri

Decl., Ex. 6 (Hebrew and English translations of the 2015 Agreement).)  The 2015 Agreement

was entered into between, on the one hand, Goldman on his own behalf and on behalf of the

Debtor and entities 41-21 28th St. Acquisition LLC, the North Flats LLC, Spencer Albee

Equities LLC, and 19 Kent Development LLC and, on the other hand, Silberstein on behalf of

himself and his heirs and representatives.  (2015 Agreement at 1, 8.)  Its terms detail, among

other things, amounts or partnership shares, as applicable, owed to Silberstein in connection with

each of the four foregoing real estate deals as well as the resolution the parties reached to resolve

each.  (*See, e.g.*, 2015 Agreement at 2–3 (providing Silberstein was owed a 10% partnership

interest in the Albee Square properties as agreed to and the right to seek payment of $3.25

million under certain circumstances); *id.* at 4 (making explicit that Silberstein was owed $1.5

million and $1.925 million in connection with the North Flats and Long Island City deals,

respectively, and agreeing that Silberstein shall receive a 10% partnership interest); *id.* at 5–6

(acknowledging that Silberstein is owed a to-be-agreed-upon amount of profits from the sale of

certain partnership interests in 19 Kent and agreeing it should be capped at $1.5 million).)

Notably, the 2015 Agreement also includes a clause that requires the parties to enter

mediation in the event of a dispute concerning the 2015 Agreement or any of the four properties,

which, if ultimately unsuccessful, would require the parties to adjudicate the matter in rabbinical

court.  (2015 Agreement at 6–7.)  Such adjudication, the agreement provides, is equivalent to an

agreement to arbitrate (the "2015 Agreement Arbitration Clause").  (*Id.*)  Specifically, the clause

states:

---

[4]      All references to the 2015 Agreement shall refer to the English translation included as Exhibit 6 to the
Silvestri Decl.

> For any question or doubt or dispute that shall arise between the parties, in all that concerns this agreement, or concerning any of the four properties mentioned above, both regarding fulfilling the essence of the agreement as well as regarding the payment of interest, as describe [sic] above, and also concerning the sale of the properties or any portion of them prior to renting out the apartments, or any other matter that both parties agree to being derived from the above properties, the parties shall turn to the mediator Rabbi Avraham Shlomo Ausch, or Rabbi Chaim Mordechai Shtesel, who are acceptable to both and who may facilitate a compromise between them; and if they are unable to agree on which of them to turn to, or if they shall be otherwise unable to turn to them, they shall adjudicate the matter before the rabbinical court (beis din) of the Hisachdus Harabonim; and the signing of this agreement shall in full effect be equal to signing an arbitration agreement before the rabbinical court of the Hisachdus Harabonim mentioned above, and according to what is customary to sign at present before those rabbinical courts that allow for it to be full in effect according to the laws of arbitration.

(*Id.*)

The Plaintiff disputes, however, the authenticity of the 2015 Agreement, describing it as "highly suspect" and questioning its admissibility into evidence. (Reply to Supplemental Facts ¶¶ 6–7; *id.* ¶ 9 ("Admitted that the 2015 Agreement, to the extent such a document could ever be properly authenticated or admitted into evidence, contains the quoted language."); *see also* Motion at 8 (asserting that it is "far from clear that the 2015 Agreement and the 2020 Agreement even meet the threshold standard for evidence that can be considered on summary judgment").) In light of such, the Plaintiff also questions whether Silberstein was actually owed any equity interests or cash. (Reply to Supplemental Facts ¶ 10.)

### C. The 2018 Promissory Note

Ultimately, Silberstein was not provided the compensation set forth in the 2015 Agreement. (Defendant SUF Response ¶ 30.) Thus, to resolve the dispute over what was owed to him, Goldman proposed to structure payment as a promissory note from Silberstein to the Debtor. (*Id.* ¶ 31; *see also* Aloe Dec., Ex. B at 33:11–19 (Goldman) ("So we did it in a way that I gave him a loan, All Year gave him a loan, because we didn't give him the shares yet. If the

shares is [sic] going to be given, then he has to give back the money because it's a loan.  If the

shares is [sic] not going to be given, he didn't want to wait anymore . . . to get at least

something.").)  Specifically, Goldman told Silberstein that "in order [for him to] release

[Silberstein] . . . it has to be in a way of a loan until [they] straighten things out with

[Silberstein's] percentage."  (Aloe Decl., Ex. A at 113:17–21 (Silberstein); Defendant SUF

Response ¶ 32 (admitting the same).)  Such loan was to be comprised of funds that Silberstein

was owed.  (*Id.* ¶ 33 (admitting that Silberstein was entitled to compensation but denying that

Silberstein ever received any proceeds under the Note); *see also* Aloe Decl., Ex. A at 77:21–24

(Silberstein) ("[A]t that time . . . this loan is a technical because it's basically my money that's

owed to me."); *id.* at 113:21–24 (Silberstein) ("So that's why I'm trying to say I was [sic]

borrowed money that I was owed, that was my money.").)  As noted above, because the Plaintiff

contests the authenticity and admissibility of the 2015 Agreement, it also takes issue with

whether Silberstein had any entitlement to equity or cash as well as the notion that Silberstein's

obligation to repay the Note was contingent.  (Reply to Supplemental Facts ¶ 14.)

Accordingly, on March 21, 2018, Silberstein—in his "personal capacity" and in his

capacity as manager of JS Skillman NY LLC ("JS Skillman")—executed a promissory note in

the principal amount of $3,350,000 (the "Note," Ravid Decl., Ex. 2) in favor of the Debtor.[5]

(*See* Note at 1; Silvestri Decl., Ex. 2 at 93:25–94:14 (Silberstein) (acknowledging that he

executed the promissory note); Defendant SUF Response ¶¶ 3–4 (admitting the foregoing only

"to the extent the document speaks for itself" but denying its enforceability).)  The Note, which

matured on March 30, 2019, provides that interest shall be "computed from the date hereof [*i.e.*,

March 21, 2018], at an annualized rate of sixteen percent (16%) to be paid on the maturity date

---

[5]      Silberstein formed JS Skillman, a limited liability company whose members were himself and his wife, to
hold title to his primary residence.  (Defendant SUF Response ¶ 35.)

of [the Note]." (Note at 1; Defendant SUF Response ¶ 6 (admitting the same).) As set forth

therein, the Note further indicates that Silberstein waived "presentment for payment, notice of

dishonor, protest, and notice of protest." (Note at 1.)

Silberstein concedes that he has failed to remit any payment under the Note despite

having received a written demand from the Debtor to pay the full amount owed on March 30,

2022. (Defendant SUF Response ¶¶ 7, 9.) The parties, however, dispute whether (i) the Debtor

distributed $3,350,000 in funds from its bank account to Silberstein, and (ii) the total amounts

owed under the Note as of the date of the Motion. (*See* Silberstein Decl. ¶¶ 2, 4 (attesting that he

never received, either personally or through JS Skillman NY LLC, payment of $3.35 million

from the Debtor or Goldman on or around March 21, 2018); Defendant SUF Response ¶¶ 5, 31

(denying that he ever received any funds); *id.* ¶ 8 (rejecting Plaintiff's assertion that

$6,834,000.97 is owed under the Note on grounds that, among other things, the Plaintiff

miscalculated the interest owed); Reply to Supplemental Facts ¶ 15 (rejecting the notion that the

Debtor never funded the Note or gave Silberstein the equity interests he was entitled to under the

2015 Agreement).)

### D. The 2020 Agreement and Release

In addition to the 2015 Agreement, Silberstein also produced in discovery an English

translation of a handwritten Hebrew document, dated October 1, 2020 (the "2020 Agreement,"

Silvestri Decl., Ex. 7), that was entered into between, on the one hand, Goldman on behalf of

himself and "AYH and company" and, on the other hand, Silberstein, and each of their

respective representatives.[6] (2020 Agreement at 1–2.) The agreement, as translated, provides

---

[6]     While the preamble to the 2020 Agreement defines "Party A" as being "Yoel Goldman and
representatives," the signature block specifies Yoel Goldman "for [himself] and on behalf of AYH and company."
(*Compare* 2020 Agreement at 1 *with id.* at 2.)

that Silberstein is owed $6 million on account of, among other things, work performed in connection with the Albee Square, Long Island City, and North Flats deals.[7]  (*Id.* at 1.)

It further states that, in resolution of the ongoing dispute over amounts due under the Note, which, as of October 1, 2020, totaled more than $4 million, Silberstein's obligations under the Note would be released.  (Defendant SUF Response ¶ 43; *see also* 2020 Agreement at 2 ("[T]he loan in the amount of 3,350,000 . . . dollars to [Silberstein] shall be forgiven, including interest").)  Indeed, any amounts due on account of the Note were to be "applied as payment for what is legally owed to [Silberstein]."  (*Id.*)  Outside of an additional $500,000 promised to Silberstein, the parties also mutually released each other from all "claims or disputes . . . [on this matter]."  (*Id.* (bracketed language in original).)

Subsequently, JS Skillman, as borrower, and the Debtor, as lender and "releasor," entered into the Release of Obligations, dated October 2, 2020 (the "Release," Silvestri Decl., Ex. 8), pursuant to which the Debtor agreed to "discharge [Silberstein] from any claims, liabilities, and obligations under the loan made on 03/21/2018 in the amount of $3,350,000" or the Note. (Release at 1; Defendant SUF Response ¶ 44 (admitting that Silberstein produced the Release in discovery).)  The Release provides that the Debtor "agrees to Release all parties connected to the original loan agreement including, if any, co-borrowers, co-signers, and guarantors."  (Release at 1.)  Goldman was the only signatory to the Release.  (*Id.*)  The Motion refers to the Release as "accompanying" the 2020 Agreement and vice versa.  (*See, e.g.*, Motion at 5 (indicating that "Counts II and IV attack the 'release' that Goldman executed on October 1, 2020 and the

---

[7]        The Statement of Undisputed Facts provides that the 2020 Agreement also pertains to 19 Kent.  (*See* SUF ¶ 38.)  However, by its terms, the 2020 Agreement makes no mention of 19 Kent, referring only to "25 Kent" which is otherwise carved out.  (*See* 2020 Agreement at 1–2.)  The depositions of Silberstein and Goldman do not offer any clarity.  (*See, e.g.*, Aloe Decl., Ex. B at 70:3–17 (Goldman) ("Does it include Kent?  I am not sure.  I did not resolve as of to date [sic]. . . . But 19 Kent, 25 Kent, it was not really a real understanding, meaning to say I didn't remember exactly what he claimed or what I claimed."); *id.* at 18:15–19 (Goldman) ("He still owed some money . . . I think 19 Kent, 25 Kent – I don't remember exactly the name of the entity – is something that is still open.").)

accompanying 2020 Agreement as fraudulent transfers"); *id.* at 10 ("[T]he 2020 Agreement and the accompanying 'release' purport to release Silberstein from the Note in exchange for Silberstein releasing the Debtor from all the obligations it allegedly owed to him.").)

As with the 2015 Agreement, the Plaintiff disputes the admissibility of the 2020 Agreement.  (*See* Reply to Supplemental Facts ¶ 16 ("[T]he 2020 Agreement is not admissible on a summary judgment record."); *see also* Motion at 8 (questioning whether the 2015 and 2020 Agreements satisfy threshold requirements for admissibility and consideration in connection with summary judgment); *id.* at 10 (asserting that the "2020 Agreement shares all the evidentiary flaws of the 2015 Agreement").)  Moreover, with respect to the Release itself, the Plaintiff also contests that the Debtor was the executing party.  (Reply to Supplemental Facts ¶¶ 18–19 (denying that the Debtor executed the Release and asserting that Goldman always dealt with Silberstein in an individual capacity).)

### E.  All Year Holding Limited's Chapter 11 Case

On December 14, 2021 (the "Petition Date"), the Debtor—a holding company that, through its subsidiaries, focused on the development, construction, acquisition, leasing, and management of residential and commercial income-producing properties in Brooklyn, New York—filed a voluntary petition for chapter 11 relief before this Court.  (Defendant SUF Response ¶ 60; Reply to Supplemental Facts ¶ 3.)  Silberstein was not listed as a creditor in the Debtor's schedules and did not file a proof of claim or participate in the Debtor's bankruptcy case.  (*Id.* ¶ 1.)

As set forth in the Disclosure Statement, the Debtor's chapter 11 case was precipitated by its precarious financial situation.  Specifically, the Debtor was "highly leveraged and eventually began to struggle to service its significant funded debt burden."  (Disclosure Statement at 15.)

While the Debtor took steps in early 2020 to manage its debts, the COVID-19 pandemic upended

the Debtor's efforts to implement deleveraging transactions.  (*Id.*)  At the same time, the

Debtor's subsidiary holdings faced significant liquidity issues that placed further stress on non-

debtor subsidiaries and the "Debtor's entire enterprise." (*Id.*)  Ultimately, "the Debtor's current

and projected revenues remained insufficient to service its debt." (*Id.*; *see also id.* at 17

(indicating that the threat of a levy of judgment against assets of the Debtor, including its cash,

"precluded the Debtor from continuing its restructuring process outside of . . . chapter 11").)

On January 31, 2023, the Court entered an order (the "Confirmation Order," Aloe Decl.,

Ex. G) confirming the Plan.

### F.  The Amended Adversary Complaint

The Complaint—filed by Ofer Tzur and Amir Flamer in their joint capacity as Claims

Administrator pursuant to the Plan and the Plan Administration Agreement (the "Plan

Administration Agreement," ECF Doc. # 312, Ex. A) against Silberstein on May 3, 2024—

asserts five causes of action as follows:[8]

- Count I – Breach of the Note for Silberstein's failure to pay amounts due thereunder. (Complaint ¶¶ 18–22.)

- Count II – Constructive fraudulent transfer claim pursuant to 11 U.S.C. § 548(a)(1)(B) with respect to the 2020 Agreement and Release.  (*Id.* ¶¶ 23–58.)

- Count III – Actual fraudulent transfer claim pursuant to 11 U.S.C. § 548(a)(1)(A) with respect to the 2020 Agreement and Release.  (*Id.* ¶¶ 59–68.)

- Count IV – Fraudulent transfer claim pursuant to N.Y. DEBTOR & CREDITOR LAW ("NYDCL") § 273 with respect to the 2020 Agreement and Release.  (*Id.* ¶¶ 69–76.)

---

[8]      As the release in question took place after the effective date of New York's Uniform Voidable Transactions Act ("UVTA"), the amended version of section 273 of the NYDCL applies.  (*See* Motion at 14 (acknowledging the same).)

- <u>Count V</u> – Alternatively, to the extent the 2020 Agreement and Release are deemed enforceable and not fraudulent transfers, a fraudulent transfer claim pursuant to NYDCL § 273 with respect to the Note.  (*Id.* ¶¶ 77–88.)

As a whole, the Complaint seeks (i) damages in an amount no less than $6,631,511.93 plus interest and post-judgment interest that, as of the Motion, has increased to $6,834,000.97; (ii) determination that the 2020 Agreement and Release are voidable and void pursuant to 11 U.S.C. § 548 and/or NYDCL § 273; (iii) attorneys' fees and costs; and (iv) any further relief the Court deems just and proper.  (*Id.* at 14–15.)

On May 17, 2024, the Defendant filed an answer (the "Answer," ECF Doc. # 28) to the Complaint that, among other things, denies certain allegations and raises twelve affirmative defenses.  (*See generally* Answer.)  In the Answer, the Defendant also demanded a jury trial on all issues and indicated, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure, that he does not consent to the Court's entry of final orders or judgments.  (*Id.* ¶¶ 102–03.)

### G.  The Motion

The Plaintiff characterizes this proceeding as a "straight-forward action for non-payment of a promissory note, about which there are no disputed material facts."  (Motion at 1.)  As discussed, the Motion seeks partial summary judgment with respect to Counts I, II, and IV of the Complaint and Silberstein's related affirmative defenses.  (Motion at 1.)  Each is addressed in turn.

#### 1.  Count I

With respect to Count I of the Complaint, which asserts a claim for breach of contract claim in connection with the Note, the Plaintiff maintains that the undisputed facts and documentary evidence support a finding that the *prima facie* elements of a breach of contract claim under New York law have been established.  (*Id.* at 5; *see also id.* at 3 (noting that the requirements are "the existence of a contract, the plaintiff's performance thereunder, the

13

defendant's breach thereof, and resulting damages" (citations omitted)).)  Specifically, the Note

is a valid and existing contract that Silberstein admits he executed, the Debtor distributed $3.35

million to Silberstein and performed under the Note, and Silberstein has not made any timely

repayment.  (*Id.* at 4.)

The Plaintiff argues, therefore, that it is entitled to damages in the amount of

$6,834,000.97 plus any interest accruing in accordance with the Note.  (*Id.*)

2.  Count II

The Plaintiff further argues that summary judgment is also appropriate with respect to

Count II of the Complaint, which "alleges that the [Release] and the 2020 Agreement are

constructive fraudulent transfers under 11 U.S.C. § 548(a)(1)(B)."  (*Id.* at 5.)  In support, the

Plaintiff argues, at the outset, that the release of the Debtor's rights to recover millions of dollars

from Silberstein, which occurred within two years of the Petition Date, constitutes a "transfer of

an interest" under section 548 of the Bankruptcy Code.  (*Id.* at 5–6.)  Moreover, the Plaintiff

contends that the Debtor received nothing in exchange for the release of Silberstein at a time

when it was "indisputably insolvent" and for "less than reasonably equivalent value."  (*Id.* at 6,

10–11.)

Notably, the Debtor, the Plaintiff maintains, never owed Silberstein anything as

Silberstein and Goldman "were dealing with each other on a strictly individual basis" and, with

the exception of the Note, "never wrote anything down."  (*Id.* at 7–8.)  Specifically, the Plaintiff

notes that the Debtor was not formed until September 17, 2014 and, therefore, did not exist until

after Silberstein and Goldman began work on the four real estate deals.  (*Id.* at 7.)

The Plaintiff also questions the authenticity and admissibility of the 2015 and 2020

Agreements since neither Silberstein nor Goldman possesses the originals.  (*Id.* at 8.)  It notes

that, even assuming they are authentic, neither the 2015 Agreement nor the 2020 Agreement

show that the Debtor owed Silberstein anything and suggest, instead, that the Debtor received

"less than reasonably equivalent value." (*Id.*)  Indeed, at best, the Plaintiff argues, the 2015

Agreement "merely establishes what Silberstein and Goldman confirmed during their

depositions: that Goldman owed Silberstein money for his work on four real estate dates from

2012–2013." (*Id.* at 9.)  Similarly, the 2020 Agreement is "simply a continuation of the same

farce on display in the 2015 Agreement, camouflaging Goldman's promises . . . as the Debtor's

obligations." (*Id.* at 10.)

Accordingly, the Plaintiff asserts that both the 2020 Agreement and the accompanying

Release constitute constructive fraudulent transfers, voidable under section 548 of the

Bankruptcy Code, and the documents "cannot, as a matter of law, establish a defense to

Plaintiff's breach of contract claim." (*Id.* at 13.)

### 3.   Count IV

Like Count II, the Plaintiff argues that the undisputed material facts establish that the

2020 Agreement and accompanying Release represent fraudulent transfers that are voidable

pursuant to NYDCL § 273. (*Id.* at 15.)  Specifically, as already discussed with Count II, the

2020 Agreement and Release represent a "gift from Goldman to Silberstein of millions of

dollars," and the Debtor received nothing in return at a time when it was insolvent. (*Id.* at 14–

15.)  Accordingly, neither can establish a defense to Count I. (*Id.* at 15.)

### H.  The Defendant's Opposition

Silberstein opposes the Motion on several grounds.  With respect to the Note, he argues

that the Plaintiff has failed to establish that it has standing to enforce the Note as the Motion does

not show that the Debtor "formally negotiated or assigned the [N]ote to Plaintiff in compliance

with the Uniform Commercial Code" or that he received $3.35 million from the Debtor for the

Note. (Opposition at 1–2, 13–14.) Thus, Silberstein argues that a genuine issue of material fact

exists concerning whether he received any consideration in exchange for the Note. (*Id.* at 15.)

As for the constructive fraudulent transfer claims, Silberstein argues that the Plaintiff

failed to establish that the Debtor was insolvent at the time the 2020 Agreement and Release

were entered into and that he did not provide reasonably equivalent value for the release. (*Id.* at

2, 18–24.) The Plaintiff's evidence, Silberstein maintains, is "plainly inadmissible hearsay" and,

in any event, the documents establish otherwise. (*Id.* at 2 (indicating that the documents show

that the Debtor had more than $500 million of equity value at the time Silberstein was released

and the parties stipulated that the Silberstein gave up claims in excess of $6 million in exchange

for obtaining a release from the Note); *id.* at 16–17 (contesting statements in the Ravid Decl.

concerning the Debtor's financial situation and the admissibility of supporting documentation);

*id.* at 24 (calling the Ravid Decl. "worthless from an evidentiary standpoint").) Silberstein

maintains that he and Goldman authenticated the 2015 and 2020 Agreements and confirmed their

signatures. (*Id.* at 19.) Moreover, he asserts that the Plaintiff has not submitted any evidence

that demonstrates that Goldman, and not the Debtor, owed the interests at issue in the relevant

real estate properties. (*Id.* at 20.) Accordingly, the Plaintiff, Silberstein argues, has failed to

eliminate all material issues of fact on its constructive fraudulent transfer claims. (*Id.* at 18–19,

22.)

Aside from the foregoing, Silberstein also maintains that summary judgment, in general,

is inappropriate at this time. (*Id.* at 2, 10.) *First*, a summary judgment ruling would "vitiate" his

arbitration rights pursuant to the 2015 Agreement Arbitration Clause where parties agreed to

adjudication before a rabbinical court. (*Id.* at 2.) Therefore, the Court cannot decide merits,

Silberstein argues, before a determination is made as to the arbitrability of the dispute.  (*Id.* at 8–9.)  *Second*, Silberstein asserts that the Court lacks constitutional authority to decide summary judgment on a final basis since, among other things, he does not consent to the Court's entry of a final order or judgment.  (*Id.* at 2, 10.)  At most, he contends, the Court may only enter proposed findings of fact and conclusions of law.  (*Id.* at 10–11.)

Finally, Silberstein argues that the Plaintiff miscalculated the interest it seeks as a matter of law.  (*Id.* at 25.)  The Note, he argues, does not provide that the 16% annual interest rate applies post-maturity, following an event of default, or until the principal amount is paid in full.  (*Id.*)  Rather, to the extent the Plaintiff is entitled to any prejudgment interest, Silberstein believes that the 9% statutory rate under CPLR 5004 should be used instead.  (*Id.*)

## I.  The Plaintiff's Reply

In response, the Plaintiff first addresses certain threshold issues that the Defendant raises.  *First*, the Plaintiff argues that a stay of the Adversary Proceeding pending a determination on the Defendant's motion to compel arbitration is not needed as the Defendant failed to properly request a stay after a motion to withdraw the reference was filed.  (Reply in Support of Motion at 2–3 (noting that Rule 5011(c) of the Federal Rules of Bankruptcy Procedure provides that a motion to withdraw the reference does not stay administration of a case or proceeding).)  In any event, even if the Court were to consider the merits of a stay, the Defendant's request would nonetheless fail since (i) the 2015 Agreement does not apply to the Note, which it predates, or any dispute outside of the four identified real estate transactions; (ii) the Defendant testified that the 2015 Agreement concerned solely disputes between Goldman and himself and did not involve the Debtor; and (iii) the Defendant waived his right to arbitrate when he failed to timely file a motion to compel arbitration and participate in this proceeding.  (*Id.* at 3–4.)

*Second*, with respect to the Court's jurisdiction, the Plaintiff indicates that there is no dispute that the Court may only enter proposed findings of fact and conclusions of law. (*Id.* at 4.) However, this alone should not prevent the Court from adjudicating the matter. (*Id.* at 5.) In addition, the Plaintiff argues that the Plan vested it with the right to pursue these claims. (*Id.*) Therefore, the Plaintiff maintains that it possesses standing to bring this lawsuit. (*Id.* at 6.)

The Plaintiff then turns to arguments raised in connection with the causes of action subject to the Motion. Beginning with the Note, the Plaintiff argues that it is undisputed that Silberstein owed the amounts under the Note and that he "admits" he received its economic benefits. (*Id.* at 7.) Specifically, the Plaintiff states that Silberstein acknowledged he signed the Note, his bank account received the funds, and he owed over $4 million—all as set forth in the 2020 Agreement, a document that Silberstein "admits he signed and indeed urges the Court to consider." (*Id.* at 7–8.) The Plaintiff highlights, as support, that Silberstein claimed that the loan proceeds constituted funds owed to him. (*Id.* at 7.) Moreover, the Debtor's general ledger, the Plaintiff maintains, shows that the balance owed to Silberstein was $3.35 million. (*Id.* at 8 (asserting that the focus should be the "net" value reflected in the Debtor's general ledger that demonstrates that the balance of Silberstein's obligations to the Debtor was $3.35 million, the amount of the Note); *see also id.* (arguing that the two financial records the Defendant rests his argument on were never produced in discovery).)

Turning to the 2020 Agreement, the Plaintiff contends that there is also no question of fact that (i) Silberstein was dealing with Goldman and not the Debtor, and (ii) the Debtor was insolvent in October 2020 for purposes of section 548 of the Bankruptcy Code and section 273 of the NYDCL. (*Id.* at 9–10.) Lastly, the Plaintiff rejects the Defendant's contention that post-

maturity interest did not accrue given its "admission" in the 2020 Agreement that over $4 million was owed.  (*Id.* at 10.)

## II.   LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure, made applicable here by Rule 7056 of the Federal Rules of Bankruptcy Procedure, generally provides that a party "may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a).  A court shall grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*  The movant bears the initial burden of demonstrating the absence of a question of material fact and, in making this determination, the Court must view all facts in the light most favorable to the nonmoving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132, 137 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets its burden, "[t]hen the onus shifts to the party resisting summary judgment." *Holcomb*, 521 F.3d at 137.  "'[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Yao v. Kao (In re Kao)*, 612 B.R. 272, 280 (Bankr. S.D.N.Y. 2020) (quoting *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)).  Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A).  Alternatively, the opposing party may also make "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c)(1)(B).  While a court need only consider the cited materials, "it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

### III.   **DISCUSSION**

**A. Threshold Issues**

      1.   <u>Plaintiff's Standing to Enforce the Note</u>

As a gating matter, the Defendant contests whether the Plaintiff has standing to enforce the Note against the Defendant.  The Plan makes clear that the Plaintiff does.

Section 5.3 of the Plan, as the Defendant acknowledges, vests the Plaintiff with, among other things, "all claims and Causes of Action . . . that the Debtor, the Noteholders, or the Notes Trustee may have against third-parties" as of the Effective Date.[9]  (*See* Plan § 5.3(a) (providing that "the Excluded Assets and the Wind Down Cash Funding shall be transferred" to the Plaintiff); *id.* § 1.42 (defining "Excluded Assets" to include, among other things, such claims and Causes of Action); *see also* Confirmation Order ¶ 6(e) (outlining what Excluded Assets will vest in the Plaintiff, which includes such claims and Causes of Action); Opposition at 3 (acknowledging the same).)  "Causes of Action" is defined to include "any action, claim, cross-claim, third-party claim, cause of action, controversy . . . belonging to the Debtor, whether arising before, on, or after the Petition Date . . . ."  (Plan § 1.18.)

Moreover, as set forth in the Plan and Plan Administration Agreement, the Claims Administrator, who the Plaintiff is acting through, possesses authority over avoidance actions and causes of action that vested in the Plaintiff pursuant to the Plan.  (*See* Plan § 1.74 (defining "Plan Administrator" under the Plan to include "those individuals selected by the Notes Trustee to serve as (a) 'plan administrator' and (b) 'claims administrator,' who will administer and implement the Plan and the Assets of [the Plaintiff], in accordance with, and pursuant to . . .

---

[9]      On April 4, 2023, the Debtor filed the *Notice of (I) Entry of Order Confirming Third Amended Chapter 11 Plan of Reorganization of All Year Holdings Limited and (II) Occurrence of Plan Effective Date* ("Notice of Effective Date," Case No. 21-12051, ECF Doc. # 382), indicating that the Plan went effective on April 4, 2023. (Notice of Effective Date ¶ 2.)

Section 5.3 of the Plan and . . . the Plan Administration Agreement"); Plan Administration

Agreement § 2.2(a) (indicating that the Claims Administrator "shall control and exercise

authority over the Avoidance Actions and Causes of Action vested in [the Plaintiff] pursuant to

the Plan, and over the litigation, management and disposition thereof"); *id.* § 2.2(b)(i) (providing

that the Claims Administrator's duties include the prosecution of "Avoidance Actions and all

other Causes of Action on behalf of [the Plaintiff]").)

Indeed, the Plan provides that the Plan Administrator, which includes the Claims

Administrator, shall be a "representative of [the Plaintiff] for purposes of section 1123(b)(3) of

the Bankruptcy Code."  (Plan § 5.3(b).)  Specifically, section 1123(b)(3) of the Bankruptcy Code

permits plans to provide for the "(A) the settlement or adjustment of any claim or interest

belonging to the debtor or to the estate; or (B) the retention and enforcement by the debtor . . . or

by a representative of the estate appointed for such purpose, of any such claim or interest."  11

U.S.C. § 1123(b)(3).

Here, Silberstein executed the Note in favor of the Debtor, which he does not dispute.

(*See* Note at 1 (specifying that Silberstein, in his personal capacity and as manager of JS

Skillman, "promises to pay to All Year Holdings, Limited . . . $3,350,000.00"); Defendant SUF

Response ¶ 3 (admitting to the foregoing regarding the Note "to the extent . . . the document

speaks for itself"); *see also id.* (denying enforceability of the Note since "**the Debtor** released

him from his obligations" (emphasis added)).)  As the Plan vests the Plaintiff with, among other

things, all Causes of Action that the Debtor may have against third parties and the Claims

Administrator possesses the ability to pursue such, the Plaintiff, acting through the Claims

Administrator, has standing to enforce the Note, a claim or cause of action that previously

belonged to the Debtor.  *See In re Glob. Fertility & Genetics, New York, LLC*, 663 B.R. 584, 602

(Bankr. S.D.N.Y. 2024) (noting that the "right to settle debtor claims" under section 1123(b)(3) "extends to any plan proponent, not just the debtor-in-possession or trustee").

Therefore, no separate negotiation or assignment of the Note to the Plaintiff, as the Defendant maintains, was necessary for the Plaintiff to bring an action to enforce the Note as the Plan already provides for it.  (*See, e.g.*, Plan § 10.1 (providing that "all Excluded Assets," which includes Causes of Action, "shall be transferred to [the Plaintiff]" on the Effective Date).  As set forth in the Plan, the Plaintiff "may take any action including without limitation . . . the assertion of any Causes of Action," which is broadly defined in the Plan to include any action or claim "belonging to the Debtor."  (Plan § 1.18 (defining "Cause of Action"); *id.* § 10.1 (describing the vesting of assets on the Effective Date).)  The Plaintiff made this clear in the preliminary statement to the Complaint, stating that certain of the Debtor's "claims vested with [the Plaintiff]," the Claims Administrator is "vested with power and authority to pursue those claims on behalf of [the Plaintiff]," and this lawsuit constitutes "one such claim."  (Complaint at 1–2.) The Court agrees.

Accordingly, the Plaintiff possesses standing to commence this Adversary Proceeding to enforce the Note.

### 2.  Court's Jurisdiction

The parties are in consensus that the Court can, at most, issue proposed findings of fact and conclusions of law.  (*See* Opposition at 10–11 ("If the Court entertains summary judgment, then it can at most issue proposed findings of fact and conclusions of law to be reviewed *de novo* by the District Court."); Reply in Support of Motion at 4 ("Plaintiff and Defendant agree that, if the Court were determine that Plaintiff is entitled to the full relief it seeks in its [Motion], it

would likely need to enter proposed findings of fact and conclusions of law.")  The Court, however, disagrees.

In general, bankruptcy court jurisdiction over civil proceedings is limited to those proceedings "arising in a bankruptcy case or arising under the bankruptcy law (*i.e.*, core proceedings), and proceedings that relate to a bankruptcy case (*i.e.*, non-core proceedings)."  *In re Ener1, Inc.*, 558 B.R. 91, 95 (Bankr. S.D.N.Y. 2016); *see* 28 U.S.C § 1334(b) (providing that "district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11").  A proceeding is considered "related to" or non-core if its outcome could have "any conceivable effect on the bankrupt estate."  *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011) (internal quotation marks omitted).  With such cases, a bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected."  28 U.S.C. § 157(c)(1).

A bankruptcy court's jurisdiction, however, "shrinks" once confirmation occurs and can vary depending on whether the debtor was reorganized or liquidated.  *Ener1*, 558 B.R. at 95.  In a reorganization case, courts will employ the "close nexus" test.  *See id.* at 95 ("When a bankruptcy court is presented with a post-confirmation dispute involving a reorganized debtor . . . case law requires the court to determine whether the dispute has a 'close nexus' to the bankruptcy case . . . .").  However, in a liquidation case, as it is here, it is unclear whether such a test also applies.  In such an instance, this Court, as previously discussed, has "follow[ed] the First Circuit's conceivable effects test."  *AYH Wind Down LLC v. Engelman (In re All Year*

*Holdings Ltd.*), No. 21-12051 (MG), 2024 WL 1460157, at *6 (Bankr. S.D.N.Y. Apr. 3, 2024).

Regardless of the test applied, the Court previously recognized that it has related-to jurisdiction

over the Plaintiff, an entity "acting to the debtor's behoof [and] whose litigation proceeds will

inure to the benefit of creditors," under both the "close nexus" and "conceivable effects" test. *Id.*

at *6 (quoting *Boston Reg'l Med. Ctr., Inc. v. Reynolds (In re Boston Reg'l Med. Ctr., Inc.)*, 410

F.3d 100 (1st Cir. 2005)) (internal quotation marks omitted).  That remains the case.

Moreover, the Motion only seeks summary judgment with respect to three of the six

counts in the Complaint.  As a general principle, "orders dismissing fewer than all claims" in an

adversary proceeding and orders for partial summary judgment are considered interlocutory.

*O'Toole v. McTaggart (In re Trinsum Grp., Inc.)*, 467 B.R. 734, 740–41 (Bankr. S.D.N.Y. 2012).

In such a circumstance, Rule 54(b) of the Federal Rules of Civil Procedure, made applicable to

adversary proceedings by Rule 7054 of the Federal Rules of Bankruptcy Procedure, makes clear

that "an otherwise interlocutory order that has not resulted in entry of a partial judgment . . .

'may be revised at any time before the entry of a judgment adjudicating all the claims and all the

parties' rights and liabilities.'"  *Id.* at 741 (quoting FED. R. CIV. P. 54(b)).  Therefore, as this

Court has recognized, "[e]ven absent consent, a bankruptcy court may enter partial summary

judgment in related-to adversary proceedings without submitting proposed findings of fact and

conclusions of law."  *Wythe Berry Fee Owner LLC v. Wythe Berry LLC (In re Wythe Berry Fee*
*Owner LLC)*, 654 B.R. 524, 528 n.2 (Bankr. S.D.N.Y. 2023); *Trinsum*, 467 B.R. at 741–42

(holding that the bankruptcy court is not required to submit proposed findings of fact and

conclusions of law when granting a motion for partial summary judgment on related-to claims).

Consistent with this, while the Defendant makes clear that he does not consent to the Court

entering final orders or judgments, the Court does need not submit proposed findings of fact and
conclusions of law as the Motion seeks only partial summary judgment relief.

3.   Pending Motion to Compel Arbitration

In addition to the foregoing, the Defendant has also argued that the Court cannot decide
the merits of the Motion or engage in "any merits-based consideration of the underlying
controversy" before a determination in the District Court is made as to the arbitrability of the
dispute.  (*See* Opposition at 8–9.)

Prior to the filing of the Complaint, on February 2, 2024, the Defendant filed the *Motion
to Withdraw the Reference and Compel Arbitration* (the "Motion to Withdraw and Compel,"
Case No. 24-cv-00800-JHR, ECF Doc. # 1) with respect to the Initial Complaint.  The Motion to
Withdraw and Compel seeks (i) a withdrawal of the reference of the Adversary Proceeding to the
District Court, and (ii) the compelling of arbitration pursuant to the 2015 Agreement Arbitration
Clause.  (*See Memorandum of Law in Support of Defendant's Motion to Withdraw the Reference
and Compel Arbitration*, Case No. 24-cv-00800-JHR, ECF Doc. # 4 at 1.)  As already noted, the
Initial Complaint contained only one cause of action—a claim for breach of the Note—that is
identical to Count I here.  (*See Plaintiff's Motion to Amend the Adversary Complaint*, ECF Doc.
# 19-2, Ex. B (containing a redline of the then-proposed Complaint against the Initial
Complaint).)

Subsequent to the filing of the Motion to Withdraw and Compel, the Plaintiff filed the
present Complaint and, on July 19, 2024, the Defendant filed the *Motion to Stay Adversary
Proceeding Pending Decision on Defendant's Motion to Withdraw the Reference and Compel
Arbitration* (the "Motion to Stay," Case No. 24-cv-00800-JHR, ECF Doc. # 12) in the District
Court pursuant to Rule 5011(c) of the Federal Rules of Bankruptcy Procedure.  The Motion to

Stay requests that the District Court stay the Adversary Proceeding pending a ruling from the

District Court on the Defendant's Motion to Withdraw and Compel.  (*See Memorandum of Law*

*in Support of Defendant's Motion to Stay Adversary Proceeding Pending Decision on*

*Defendant's Motion to Withdraw the Reference and Compel Arbitration*, Case No. 24-cv-00800-

JHR, ECF Doc. # 14 at 1.)  Both the Motion to Withdraw and Compel as well as the Motion to

Stay remain pending in the District Court, and no separate motion seeking a stay of the

Adversary Proceeding has been filed before this Court.

Rule 5011 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, the

following:

> (a) Withdrawing a Case or Proceeding.  A motion to withdraw a case or
> proceeding under 28 U.S.C. § 157(d) must be heard by a district judge. . . .
>
> (c) Staying a Proceeding After a Motion to Withdraw or Abstain.  A motion
> filed under (a) or (b) does not stay proceedings in a case or affect its
> administration. But a bankruptcy judge may, on proper terms and
> conditions, stay a proceeding until the motion is decided.
>
> (d) Motion to Stay a Proceeding.  A motion to stay a proceeding must
> ordinarily be submitted first to the bankruptcy judge. If it—or a motion for
> relief from a stay—is filed in the district court, the motion must state why
> it was not first presented to or obtained from the bankruptcy judge.  The
> district judge may grant relief on proper terms and conditions.

FED. R. BANKR. P. 5011(a), (c), and (d).  Therefore, pursuant to Rule 5011(c), a motion to

withdraw the reference does not ordinarily require that a court stay a proceeding until such

motion is decided.  *See id.* § (c) (providing that a motion to withdraw "does not stay proceedings

in a case or affect its administration" but grants a bankruptcy judge discretion "on proper terms

and conditions" to "stay a proceeding until the motion is decided").

Here, however, the Motion to Withdraw and Compel also includes a request to compel

arbitration pursuant to the 2015 Agreement Arbitration Clause.  Determining whether the Court

should refrain from ruling on the Motion or the "underlying controversy" pending the District

26

Court's ruling on the Defendant's request to compel arbitration and, relatedly, the Motion to Stay necessarily requires an initial determination of whether the 2015 Agreement Arbitration Clause encompasses the dispute at hand. *Cf. Coinbase, Inc. v. Bielski*, 599 U.S. 736, 741–43 (2023) (holding that a district court should stay proceedings pending an interlocutory appeal on the question of arbitrability, which amounts to "entire case [to be] essentially 'involved in the appeal'"); *Aukema v. Chesapeake Appalachia, LLC*, 839 F. Supp. 2d 555, 559 (N.D.N.Y. 2012) (concluding that considerations of "judicial economy, which includes the commonality of issues and the likelihood that arbitration will resolve any common issues" were necessary in determining whether a discretionary stay was necessary pending a ruling on a motion to compel arbitration in a separate proceeding).

As discussed, however, the Plaintiff questions the authenticity of the 2015 Agreement and disputes whether the agreement can even be admitted into evidence for the Court's consideration at this time. (*See, e.g.*, Motion at 8 (asserting that it is "far from clear that the 2015 Agreement and the 2020 Agreement even meet the threshold standard for evidence that can be considered on summary judgment").) Without the ability to consider the language of the 2015 Agreement, the Court cannot determine at this time whether the relevant clause encompasses the current dispute. Thus, the Court reserves the issue whether it can rule on the merits of the underlying dispute pending a determination at trial as to the authenticity and admissibility of the 2015 Agreement.[10] In any event, as discussed in greater detail below, the Court is denying the Motion in its entirety, rendering the issue moot for purposes of summary judgment.

---

[10] The Plaintiff argues, among other things, that the Court should not wait for the District Court to rule given that the Defendant (i) filed the Motion to Stay three months after the Motion to Withdraw and Compel was filed and (ii) such motion was filed before the District Court as opposed to this Court. (Reply in Support of Motion at 2–3.) However, there are no requirements in Rule 5011 of the Federal Rules of Bankruptcy Procedure concerning when or where a motion to stay must be filed. *See* FED. R. BANKR. P. 5011(d) (containing no language imposing a timing

**B. Count I**

Count I of the Complaint asserts a breach of contract claim in connection with the Note for Silberstein's failure to repay amounts due thereunder. For the reasons discussed below, the Court **DENIES** the Motion as to Count I.

1. New York Law Applies

As an initial matter, the Court must determine the applicable state law to the breach of contract claim. *See, e.g.*, *Drexel Burnham Lambert Grp., Inc. v. Vigilant Ins. Co.*, 130 B.R. 405, 408 (S.D.N.Y. 1991) ("As far as Drexel's breach of contract claim for money damages is concerned, the determination of whether there should be a monetary recovery by reason of insurance coverage losses arising out of now pending federal securities actions is . . . a state-law issue most appropriately decided by the State Court."); *AEG Liquidation Trust v. Toobro N.Y. LLC (In re Am. Equities Grp., Inc.)*, 460 B.R. 123, 129 (Bankr. S.D.N.Y. 2011) (noting that claims asserted in the adversary proceeding included, among other things, a claim for breach of contract, which is a "generic state-law cause[] of action[]").

Generally, in cases involving a contract with an "express choice-of-law provision[,] [a]bsent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000)); *see also Danial v. Langenbach*, No. 12 CV 2983 VB, 2014 WL 5169389, at *9 (S.D.N.Y. Oct. 14, 2014) (stating the same while noting also that this is the "well-settled policy of the courts of New York"). In

---

requirement or a requirement that the motion be filed before a certain court). Rather, the rule provides only that such motions "must ***ordinarily*** be submitted first to the bankruptcy judge," and, to the extent such a motion is filed in the district court, the motion must "state why it was not first presented to or obtained from the bankruptcy judge" in which case a "district judge may grant relief on proper terms and conditions." *Id.* (emphasis added); *see also* 9 Collier on Bankruptcy ¶ 5011.04 (stating only that a motion for stay under Rule 5011(d) is "ordinarily to be determined by the bankruptcy judge and should be filed with the bankruptcy clerk," and to the extent a party "seeks to file a motion with the district court . . . that motion, too, should be filed with the bankruptcy clerk").

instances, however, where a contract lacks a choice of law provision, the "controlling law would be the contract's 'center of gravity,' which typically is the place of contracting or performance." *TCA Television Corp. v. McCollum*, 839 F.3d 168, 188 (2d Cir. 2016) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997)).

Here, as the Plaintiff appears to suggest, that "center of gravity" is New York. Therefore, New York law applies. Each of the parties to the Note are based in New York, including the Debtor who, while incorporated in the British Virgin Islands, specified 199 Lee Avenue # 693, Brooklyn, New York 11211 as its address. (*See* Note at 1 (providing Brooklyn addresses for both the Debtor and Silberstein).) Moreover, the Note was entered into in New York state and was allegedly entered into on account of amounts owed to Silberstein in connection with certain New York-based real estate deals. (*See id.* at 2 (containing the statement of a New York notary, acknowledging the Defendant's signature on the Note).) Indeed, the Plaintiff cites New York law in articulating the elements of a breach of contract claim that would entitle it to summary judgment relief on Count I. (*See* Motion at 3 (citing to New York state law and its requirements for a breach of contract claim).) The Defendant has not suggested that a different state's law applies. Accordingly, the Court determines that New York law governs the Note.

 2.  <u>Summary Judgment Cannot Be Granted</u>

"Under New York law, the elements of a breach of contract claim are (1) the existence of an agreement, (2) performance of the contract by the plaintiff, (3) breach of the agreement by the defendant, and (4) damages." *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 529 (S.D.N.Y. 2007). Here, while there is no dispute regarding the existence of the Note and Silberstein's breach, there is a dispute of material fact regarding whether the Debtor performed (*i.e.*, whether the Debtor provided Silberstein with funds in accordance with the Note). The

Defendant has repeatedly denied ever receiving the funds.  (*See, e.g.*, Defendant SUF Response ¶ 5 ("Silberstein specifically testified during his deposition that he did not recall receiving any money from the Debtor personally or through JS Skillman NY LLC."); *id.* ¶¶ 31–33 (denying that Silberstein received any proceeds from the Debtor or Goldman in connection with the Note).)

To support its contention that such funds were indeed paid to the Defendant, the Plaintiff provided copies of a general accounting ledger for All Year Holdings LLC, a non-debtor entity wholly owned by the Debtor, as well as a summary overview of the relevant transactions:

| Date | Payee | Increase (USD) | Decrease (USD) | Balance (USD) | Type | Account |
|---|---|---|---|---|---|---|
| 3/29/2018 | None specified | 4,500,000.00 | | 3,350,000.00 | Deposit | All Year Holdings LLC |
| 3/21/2018 | JS Skillman LLC | | 4,500,000.00 | 7,850,000.00 | Check | All Year Holdings LLC |
| 3/21/2018 | JS Skillman LLC | | 450,000.00 | 3,350,000.00 | Check | All Year Holdings LLC |

(Ravid Decl., Ex. 3; Disclosure Statement at 252 (containing an organizational chart of the Debtor).)  The Plaintiff argues that, in this instance, the proper focus for the Court is on the "net value" of the transactions.  (Reply in Support of Motion at 8.)  It asserts that, because the "net value" reflects that the "balance of Mr. Silberstein's obligations to the Debtor was precisely $3,350,000, the ***exact amount*** of the principal under the Note," there is no dispute of material fact that Debtor performed under the Note and Silberstein received the money.  (*Id.* (emphasis in original).)

At the same time, however, the Plaintiff also acknowledges that "there was an informal free flow of cash between [Silberstein] and the Debtor." (*Id.*) Indeed, both Silberstein and Goldman testified that they exchanged money frequently. (*See, e.g.*, Aloe Decl., Ex. A at 54:11–13 (Silberstein) ("Q: You said Mr. Goldman constantly asked you for money? A: Well, we constantly had dealings."); *id.* at 55:16–23 (Silberstein) (indicating that it was "possible" Goldman's bank account statements would reflect transactions where Goldman asked him to "move funds into some of his businesses"); *id.* at 56:8–11 (stating that it was also probable that Silberstein requested money from Goldman and Goldman would move money over); *id.*, Ex. B at 22:23–23:25 (Goldman) ("Q: Have you ever loaned Mr. Silberstein money personally? A: Probably he loaned me, probably I loaned him. I don't remember . . . . There was [sic] definitely transactions, but I don't remember if it was as a straight-out loan, or it was just in the spirit of the business, or in the merit of the business long gone.") Therefore, it is not clear whether the funds transferred to Silberstein's bank account on March 21 were, in fact, on account of the Note as opposed to other transactions or dealings between the parties.

The Plaintiff also relies on the language of the 2020 Agreement, stating that, by its terms, the Defendant admits to having received a loan on account of which he owed in excess of $4 million as of the date of that agreement. (Reply in Support of Motion at 7.) However, as discussed, the Plaintiff questions the authenticity of the 2020 Agreement and its admissibility for purposes of summary judgment. (*See* Reply to Supplemental Facts ¶ 16 ("[T]he 2020 Agreement is not admissible on a summary judgment record."); *see also* Motion at 8 (questioning whether the 2015 and 2020 Agreements satisfy threshold requirements for admissibility and consideration in connection with summary judgment); *id.* at 10 (asserting that the "2020 Agreement shares all the evidentiary flaws of the 2015 Agreement").)

31

Accordingly, as it is unclear at this time whether the March 21 transfers were on account of the Note and the Debtor performed, summary judgment as to Count I cannot presently be granted.

### C. Counts II and IV

In addition to Count I, the Plaintiff also seeks summary judgment with respect to Counts II and IV, both of which pertain to the 2020 Agreement and the "accompanying" Release under separate fraudulent transfer theories. Specifically, Count II alleges that the 2020 Agreement and Release are constructive fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code while Count IV argues that they are fraudulent transfers under section 273 of the NYDCL. (Motion at 5.) For the reasons discussed below, the Court **DENIES** the Motion with respect to Counts II and IV.

Section 548(a)(1)(B) provides, in relevant part, that a trustee may avoid:

> [A]ny *transfer* . . . of an interest of the debtor in property, or any *obligation* . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily— . . .
>
> (B)
>
>> (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>>
>> (ii)
>>
>>> (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>>>
>>> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>>>
>>> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B) (emphasis added).

Thus, to prevail on a constructive fraudulent conveyance claim under the Bankruptcy Code, a trustee must show, *inter alia*, that the debtor received "less than a reasonably equivalent value in exchange for such transfer." 11 U.S.C. § 548(a)(1)(B)(i). "The heightened federal pleading standard for allegations of fraud does not apply to a complaint to avoid transfers as constructively fraudulent." *Bernard L. Madoff Inv. Secs. LLC*, 445 B.R. 206, 225 (Bankr. S.D.N.Y. 2011) (citing *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 801–02 (Bankr. S.D.N.Y. 2005)). "As the party seeking to avoid the transaction, the Trustee bears the burden of proof by a preponderance of the evidence" on all elements of a claim for constructive fraudulent conveyance under § 548(a)(1)(B). *Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Grp., Inc.)*, 232 B.R. 565, 570 (Bankr. N.D.N.Y. 1999) (citation omitted).

Meanwhile, section 273 of the NYDCL provides, in relevant part, that:

> (a) A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1) with actual intent to hinder, delay or defraud any creditor of the debtor; or
> >
> > (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> >
> > > (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > >
> > > (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

N.Y. DEBT. & CRED. § 273(a).[11]  The statute, which focuses on whether "reasonably equivalent value" was given in exchange, mirrors section 548(a)(1)(B) of the Bankruptcy Code.  *See O'Toole v. Heinemann (In re Fun Bowl Vacations, Inc.)*, No. 21-22521 (KYP), 2025 WL 32900, at *5 n.9 (Bankr. S.D.N.Y. Jan. 6, 2025) (noting that the "current iteration of the New York constructive fraudulent transfer statute more closely tracks section 548(a)(1)(B) of the Bankruptcy Code because it focuses on whether 'reasonably equivalent value' was given in exchange . . . rather than an analysis of 'fair consideration'"); *Pergament v. Martino (In re Martino)*, 652 B.R. 416, 422 (Bankr. E.D.N.Y. 2023) (indicating that the "relevant elements of § 273 mirror the relevant elements of § 548(a)(1)(B)").

As discussed, the Plaintiff has argued that the 2020 Agreement is inadmissible for summary judgment purposes.  (*See* Reply to Supplemental Facts ¶ 16 (stating in plain terms its belief that the 2020 Agreement is "not admissible on a summary judgment record"); *see also* Motion at 8 (arguing that it is "far from clear" whether the 2015 and 2020 Agreements meet threshold requirements for admissibility and consideration on summary judgment).)  Moreover, while the Plaintiff does not dispute the admissibility of the Release, the Plaintiff seems to suggest that the 2020 Agreement and the Release are related, referring to each as "accompanying" the other.  (*See, e.g.*, Motion at 5 (referring to the 2020 Agreement as "accompanying" the Release); *id.* at 10 (referring to the Release as "accompanying" the 2020 Agreement).)

---

[11]    New York enacted the UVTA in 2019, which amended and repealed certain portions of the NYDCL, including section 273, but did not apply to transfers made before it became effective in April 2020.  As noted already, because the 2020 Agreement and Release were entered into on October 1, 2020 and October 2, 2020, respectively, the amended version of section 273 applies.

Thus, the Court would first need to address the admissibility of the 2020 Agreement

before it can determine whether the Plaintiff is entitled to relief under Counts II and IV.

Accordingly, summary judgment as to Counts II and IV also cannot be granted at this time.[12]

### D. Affirmative Defenses

Generally, by its own language, Rule 56 may be applied to claims and defenses.  *See* FED.

R. CIV. P. 56(a) (provides that a party "may move for summary judgment, identifying each claim

or defense—or the part of each claim or defense—on which summary judgment is sought").

Where a plaintiff seeks summary judgment to "challenge the legal sufficiency of an affirmative

defense—on which the defendant bears the burden of proof at trial—a plaintiff 'may satisfy its

Rule 56 burden by showing that there is an absence of evidence to support [an essential element

of] the [non-moving party's] case.'"  *FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994)

(quoting *DiCola v. SwissRe Holding (North America), Inc.*, 996 F.2d 30, 32 (2d Cir. 1993)

(internal quotations omitted)).  This is consistent with the notion that "in cases where there is an

absence of evidence to support an essential element of a defense, with respect to that defense

---

[12]     As a general matter, avoidance claims belong to the estate and are not subject to arbitration.  Claims that belong exclusively to a trustee or debtor in possession belong to creditors who were not parties to the arbitration agreement and, therefore, are not subject to arbitration.  In *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149 (3d Cir. 1989), the Third Circuit refused to compel arbitration of fraudulent transfer claims while compelling arbitration of various state and federal securities claims.  The court rejected the argument that the trustee was not generally bound by the arbitration clause in that case (to the extent the rights asserted by the trustee were derivative of the debtor), but the court distinguished the fraudulent transfer claims, holding that such claims are not arbitrable:

> Claims asserted by the trustee under section 544(b) are not derivative of the bankrupt.  They are creditor claims that the Code authorizes the trustee to assert on their behalf.  The Supreme Court has made it clear that it is the *parties* to an arbitration agreement who are bound by it and whose intentions must be carried out.  Thus there is no justification for binding creditors to an arbitration clause with respect to claims that are not derivative from one who was a party to it.

*Hays,* 885 F.2d at 1155 (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 625 (1985)) (emphasis in original); *Bethlehem Steel Corp. v. Moran Towing Corp. (in re Bethlehem Steel Corp.),* 390 B.R. 784, 790 (Bankr. S.D.N.Y. 2008) ("In this Circuit, courts have exempted fraudulent transfer claims from arbitration because they are statutory claims belonging to the trustee and are not claims derivative of the debtor's own rights.").

'there can be no genuine issue as to any material fact since a complete failure of proof concerning an essential element of the [defendant's affirmative defense] necessarily renders all other facts immaterial.'"  *Giammettei*, 34 F.3d at 54–55 (quoting *Celotex*, 477 U.S. at 323) (internal quotations omitted).  As such, "[f]ederal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."  *Dunkin' Donuts Franchised Rests. LLC v. Tim & Tab Donuts, Inc.*, No. 07-CV-3662 (KAM) (MDG), 2009 WL 2997382, at *9 (E.D.N.Y. Sept. 15, 2009) (finding defendants abandoned their affirmative defenses and counterclaims by failing to oppose and granting plaintiffs' motion for summary judgment as to the same) (citation omitted).

As the Court has determined that the Motion cannot be granted, it need not address the Defendant's affirmative defenses at this time.

## IV.    <u>CONCLUSION</u>

For the reasons discussed, the Court **DENIES** the Motion.

**IT IS SO ORDERED.**

Dated:    February 18, 2025
          New York, New York

_____*Martin Glenn*_____
MARTIN GLENN
Chief United States Bankruptcy Judge